STATE OF CONNECTICUT *v.* ZOLTAN KISH

SPEZIALE, C. J., HEALEY, PARSKEY, ARMENTANO and SHEA, Js.

Argued February 10—decision released April 27, 1982

*Richard T. Meehan, Jr.,* with whom, on the brief, were *James J. Gentile* and *Mark T. Altieri,* for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to the jury, the defendant was found guilty of sexual assault in the first degree in violation of General Statutes § 53a-70 (a).[1] On appeal, he claims that the trial court erred: (1) in denying his motion for judgment of acquittal claiming that the state failed to prove that he committed sexual assault in the first degree; (2) in admitting certain testimony offered under the "constancy of accusation" exception to

---

[1] General Statutes § 53a-70 provides: "(a) A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

the hearsay rule; (3) in failing to instruct the jury on the limited purpose of such testimony as to all four witnesses through whom such testimony was offered; (4) in its jury instruction concerning the defendant's interest in the outcome of the trial; and (5) in failing to instruct the jury that they might draw an adverse inference from the state's failure to call the victim's husband as a witness.

From the evidence presented at the trial, the jury could reasonably have found the following:[2] On April 14, 1980, the victim and her husband resided in Monroe. At about 10 p.m. on that date, the victim received a telephone call at her home in response to an advertisement placed by her in the Bargain News offering a baby carriage for sale. The caller, who identified himself as Zoltan, said he would be coming from Fairfield and asked her if it would be all right if he came to examine the carriage. After she spoke to her husband, who indicated that it was all right, she told him that he could come and she gave him directions to her house. The victim waited for the defendant while her husband went to bed. He arrived at 11:30 p.m. saying that he had trouble finding her house. She showed him the carriage and he told her that he was buying the carriage for a friend of his girl-friend.

He asked her for a drink of water and then asked to sit in the living room so he could rest his eyes. After informing her that he wanted the carriage but that he did not have his wallet, he said he would like to come back the next morning to buy the car-

[2] Because the defendant claims that the state did not prove "sexual intercourse" or "force" we set out the evidence at this point before discussing the error assigned to the trial court's denial of his motion for judgment of acquittal.

riage. This was agreeable to her but she told him that she had an appointment at 10 a.m., that she would be home about noon and that he was to call first. After the defendant left, she spoke to her husband telling him that the defendant was very strange and gave her the "creeps."

The next morning the victim arose at 6 a.m. and, after her husband left for work at 7 a.m. and her older child had gone to school, she called a neighbor, Sandy Baccash, at about 8 a.m. She told Baccash that a man was coming to pick up the baby carriage and for Baccash to come to her house around noon to be with her because she thought the man was weird. After putting her baby daughter in her crib in the master bedroom for a nap, she took a shower.

At approximately 10 a.m., the victim was setting her hair in the master bedroom, where the baby was asleep, when the doorbell rang. Attired in a maternity blouse and maternity slacks, she looked out a bedroom window and saw the defendant's car. She went to the kitchen, which is across from the front hall and front door, where the telephone is located, to call Baccash. As she was about to dial, she saw the defendant looking through the window in the front door. She put the phone down and opened the front door admitting the defendant. After telling him that he was not expected until noon, she began to disassemble the carriage when he told her, "Never mind. Don't bother. Make me a cup of coffee." He followed her into the kitchen as she went to make the coffee. She was nervous and started shaking because she "knew he was going to pull something on me." She made the coffee and she knew "right then and there [she] had to make that phone call before he tried something." She

picked up the phone, walked into the parlor with it and dialed Baccash's number. After asking Baccash to come over right away, she went back into the kitchen and hung up the phone.

Upon her return to the kitchen the defendant got up, approached the victim and put his hand on her left shoulder. She told him "to take his hand off [her]." He then grabbed her wrist and "just forced [her] into the bedroom. He had a grip on [her]."[3] At that time she said, "Please don't hurt me," and he said, "I won't hurt you." In the bedroom he made her lie down on the bed and told her to take her pants off. At that time the baby started to wake up and began crying and she asked him not to hurt the baby. He said, "I won't hurt the baby, just take your pants off." She then took off her pants. She was on her back and he was standing next to the bed. He then removed her panties. On this day the victim was in the middle of her menstrual cycle and the sanitary pad she had on did not come off when her panties were removed but remained on her body. He removed the pad from her vagina. He lifted her blouse and bra, put his hand on her left breast and his mouth on her nipple.

After doing this, which lasted only a few seconds, he put his hand down on her vagina and "his mouth on the lips of [her] vagina." She never actually saw him put his lips on her vagina, but she "felt them" and "saw his head there." Before he did this

---

[3] On cross-examination, after pointing out that her bedroom is clearly visible from the kitchen, she said, "[H]e grabbed—he just dragged me down there." She testified that as she was being dragged down the hall she "was in fear of [her] life." There was in evidence a photograph of the victim's wrist and arm representing, inter alia, "an abrasion or discoloration."

he asked her to open her legs; she said she would not and she froze. He then told her that if she didn't open up her legs, he would hurt her.

The doorbell rang and the defendant told her to get dressed and quiet the baby. He then walked out of the bedroom. She checked the baby, put her slacks on and then got her husband's .45 caliber handgun which was between the mattress and the box spring. When she came out of the bedroom, she saw Baccash and the defendant in the hallway.[4] She cocked the gun and yelled to Baccash, "Sandy, he tried to rape me. Call the cops. Hurry up."[5] The defendant saw the gun, went to the door and left the house. The first policeman, Officer Anthony J. Pucci, arrived at her residence approximately five to seven minutes after he got called to go there.[6] A Monroe detective, one Bernard Halapin, came shortly thereafter.[7] Later the same day, the victim saw her family physician, John Gulash, and he testified at the trial.

In claiming that the state failed to prove the offense of sexual assault in the first degree beyond a reasonable doubt, the defendant argues that the state failed to prove two fundamental elements of the charge: (1) the fact that sexual intercourse had taken place and (2) that the defendant had com-

[4] Baccash testified that the victim was "screaming for him to leave," that she was "shaking, crying . . . quite upset," that "her hair was in rollers that were hanging out," that "she had her pants on backwards."

[5] The victim handed the gun to Baccash and called the police. She called the wrong police department, Trumbull, not Monroe, but they connected her with the Monroe police.

[6] Pucci testified that he received the call to go to the victim's residence at approximately 10:30 a.m.

[7] Halapin testified that it was "maybe 10:20, 10:30" when his sergeant ordered him to go to the victim's residence.

pelled the victim to engage in the act by the use of force.[8]  The defendant's plea of not guilty put in issue every essential element of the crime charged thus requiring the state to prove every such element beyond a reasonable doubt.  *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975); *State* v. *Mason,* 186 Conn. 574, 585, 442 A.2d 1335 (1982); *State* v. *Griffin,* 175 Conn. 155, 162, 397 A.2d 89 (1978).

This claim first requires us to determine whether "sexual intercourse," as charged, in fact could be found to have been proven.  General Statutes § 53a-65 (2) defines "sexual intercourse" as meaning "vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. . . . Its meaning is limited to persons not married to each other."  The state, having particularized its accusation to cunnilingus by the use of force was limited to proving that the defendant committed the offense charged in substantially the manner described.  See *State* v. *Ruiz,* 171 Conn. 264, 270, 368 A.2d 222 (1976).  Our penal code does not define

[8] The information charged that the defendant "compelled [the victim] to engage in sexual intercourse by the use of force . . . in violation of Section 53a-70 (a) . . . ."  The defendant filed a "Motion for Statement of Essential Facts" in which he sought an order "mandating the prosecuting authority to provide [a] statement of essential facts in support of the information charging the Defendant with sexual intercourse by the use of force, in violation of Section 53a-70 (a) of the Connecticut General Statutes."  The state responded as follows:  "The defendant, Zoltan Kish, by the use of force against [the victim], compelled the said [victim] to engage in cunnilingus on April 15, 1980 at or about 10:00 AM at a home located [in] Monroe, Connecticut."

"cunnilingus." It is commonly defined as the "stimulation of the vulva or clitoris with the lips or tongue." Webster, Third New International Dictionary. "Vulva" means "the external parts of the female genital organs." Id. In its charge to the jury, the court instructed, without exception by defense counsel, as follows: "Cunnilingus is sexual stimulation of the clitoris or vulva by the lips or tongue. The vulva consists of the external parts of the sex organs." Had the statute contained a specific definition of the term, the court would have been bound to accept it. *State* v. *Mason*, supra; *International Business Machines Corporation* v. *Brown*, 167 Conn. 123, 134, 355 A.2d 236 (1974); *First Federal Savings & Loan Assn.* v. *Connelly*, 142 Conn. 483, 115 A.2d 455, appeal dismissed, 350 U.S. 927, 76 S. Ct. 305, 100 L. Ed. 811 (1955). Otherwise, the words of the statute "are to be given their commonly approved meaning, unless a contrary intent is clearly expressed." *Holmquist* v. *Manson*, 168 Conn. 389, 393, 362 A.2d 971 (1975); *State* v. *Antrum*, 185 Conn. 118, 122, 440 A.2d 839 (1981); General Statutes § 1-1. The court properly defined the term "cunnilingus."

In arguing that the crime charged was not proven, the defendant argues that "the trial testimony is void of any element demonstrating penetration." This claim is without merit. We conclude that penetration is not required under our statutory scheme for the commission of cunnilingus. The rule of statutory construction is that "[a] statute should not be construed as altering the common law rule, farther than the words of the statute import, and should not be construed as making any innovation upon the common law which the statute does not fairly express. *Dennis* v. *Shaw*,

137 Conn. 450, 452, 78 A.2d 691 [1950]; see *Shaw* v. *Railroad Co.*, 101 U.S. 557, 565, 25 L. Ed. 892 [1879]." *Skorpios Properties, Ltd.* v. *Waage*, 172 Conn. 152, 156, 374 A.2d 165 (1976). This criminal statute which is in derogation of the common law; *Edmundson* v. *Rivera*, 169 Conn. 630, 633, 363 A.2d 1031 (1975); must be strictly construed. See *State* v. *DeMartin*, 171 Conn. 524, 544, 370 A.2d 1038 (1976); *State* v. *Pastet*, 169 Conn. 13, 21–22, 363 A.2d 41, cert. denied, 423 U.S. 937, 96 S. Ct. 297, 46 L. Ed. 2d 270 (1975).

The definitional statute that has reference to the crime charged is General Statutes § 53a-65. That statute, which includes the definition of sexual intercourse, in its terms, provides that "[p]enetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio . . . ." General Statutes § 53a-65 (2). It specifically omits cunnilingus. Therefore, penetration is not an essential element of the crime where cunnilingus is charged. See *State* v. *McParlin*, 422 A.2d 742, 745 n.6 (R.I. 1980). In reaching this conclusion it is not necessary "for us to search out some intent which we may believe the legislature actually had and give effect to it, but we are confined to the intention which is expressed in the words it has used." *Connecticut Light & Power Co.* v. *Walsh*, 134 Conn. 295, 301, 57 A.2d 128 (1948). The use of specific words to define acts for which penetration is required connotes the legislative intent to exclude that which is not specifically stated. See *State ex rel. Barlow* v. *Kaminsky*, 144 Conn. 612, 620, 136 A.2d 792 (1957); *In re Hubbard*, 62 Cal. 2d 119, 126–27, 396 P.2d 809 (1964), overruled on other grounds, *Bishop* v. *San Jose*, 1 Cal.

3d 56, 63 n.6, 460 P.2d 137 (1969) (ordinance prohibiting certain enumerated gambling activities); *Patrolmen's Benevolent Assn. of the City of New York* v. *New York,* 41 N.Y.2d 205, 208–209, 359 N.E.2d 1338 (1976); 2A Sutherland, Statutory Construction (4th Ed. Sands 1973) §§ 47.23, 47.24. "Unless there is evidence to the contrary, statutory itemization indicates that the legislature intended the list to be exclusive." *Silva* v. *Botsch,* 120 N.H. 600, 602, 420 A.2d 301 (1980); 2A Sutherland, supra, §§ 47.23-47.25; 73 Am. Jur. 2d, Statutes §§ 210, 212. Since penetration is not required, the evidence discussed above is sufficient to prove the crime charged.

The defendant also claims that the state failed to prove that the defendant compelled the victim to engage in the act by the use of force. The statute with which the defendant was charged (General Statutes § 53a-70 [a]) provides, as relevant here, that "[a] person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person . . . ." Section 53a-65 (7) of the General Statutes defines "[u]se of force" to include "use of actual physical force or violence or superior physical strength against the victim." We note here that the legislature has provided a clear statutory definition of the term "use of force" and that it contains no words not commonly used which might not be understood in their ordinary meaning. See *State* v. *Mastropetre,* 175 Conn. 512, 523, 400 A.2d 276 (1978). The issue of the "use of force" presented a question of fact

for the jury and the evidence as we have set it out above supports the jury's verdict.[9] See *State* v. *Morgan,* 170 Conn. 110, 112, 365 A.2d 99 (1976).

"We have repeatedly stated the test which this court employs to determine whether the evidence is sufficient to sustain a verdict: ' "[T]he issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt . . . ." ' *State* v. *Gaynor,* 182 Conn. 501, 503, 438 A.2d 749 (1980), quoting *State* v. *Festo,* 181 Conn. 254, 259, 435 A.2d 38 (1980); *State* v. *Nemeth,* 182 Conn. 403, 410, 438 A.2d 120 (1980); *State* v. *Saracino,* 178 Conn. 416, 419, 423 A.2d 102 (1979); *State* v. *Jackson,* 176 Conn. 257, 262, 407 A.2d 948 (1978). 'In ruling on such a motion, the evidence presented at the trial must be given a construction most favorable to sustaining the jury's verdict.' *State* v. *Jackson,* supra, 262; see *State* v. *Nemeth,* supra; *State* v. *Chetcuti,* 173 Conn. 165, 172, 377

[9] Our penal code as originally enacted provided, in relevant part, in General Statutes § 53a-72 (a): "A male is guilty of rape in the first degree when he engages in sexual intercourse with a female: (1) By forcible compulsion." That code, in General Statutes § 53a-65 (8) defined "[f]orcible compulsion" to mean "physical force that overcomes earnest resistance; or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person, or in fear that he or another person will immediately be kidnapped." In 1975, the definitional section, i.e., General Statutes § 53a-65, was rewritten by Public Acts No. 75-619, § 1. The term "[f]orcible compulsion" was deleted by the 1975 amendment and the term "[u]se of force" in its present definition was enacted together with other terms and definitions not relevant here. We should note that this court has consistently refrained from applying the "utmost resistance" test in rape cases. See *State* v. *Mastropetre,* 175 Conn. 512, 523, 400 A.2d 276 (1978) and cases there cited.

A.2d 263 (1977). Each essential element of the crime charged must be established by proof beyond a reasonable doubt, ' "and although it is within the province of the jury to draw reasonable, logical inferences from the facts proven, they may not resort to speculation and conjecture." ' *State* v. *Gaynor,* supra, 503; *State* v. *Festo,* supra, 259." *State* v. *Stankowski,* 184 Conn. 121, 126, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). It is apparent from the verdict that the jury chose to believe, as was its right, the state's evidence and to disbelieve the defendant's version. On the evidence adduced at the trial, the jury could reasonably have found that the state had proven the defendant guilty of the crime charged beyond a reasonable doubt. *State* v. *Stankowski,* supra, 127; see *Jackson* v. *Virginia,* 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) ; *Johnson* v. *Wyrick,* 653 F.2d 1234, 1241 (8th Cir. 1981) ; *State* v. *Avcollie,* 178 Conn. 450, 469–70, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980).

The defendant's next claim goes to our constancy of accusation exception to the hearsay rule. His dual claim here (1) questions the continued viability of constancy of accusation as a valid exception to the hearsay rule and (2) urges error in the trial court's failure to instruct on the limited purpose of that testimony as to all four witnesses who so testified.

The constancy of accusation exception to the hearsay rule, in cases such as this, is quite viable in this jurisdiction. We need only refer to our recent decisions in *State* v. *Brigandi,* 186 Conn. 521, 442 A.2d 927 (1982) and *State* v. *Brice,* 186 Conn. 449, 442 A.2d 906 (1982).

We cannot accept the defendant's claim that the trial court erred in not instructing the jury on the limited purpose of the constancy of accusation testimony as to all four witnesses who gave such testimony. Those witnesses were Mrs. Baccash, Dr. Gulash, Officer Pucci and Detective Halapin. The defendant submitted a request to charge on the limited purpose for which the jury could utilize such testimony which, in its terms, was specifically limited to the police officers. The trial court closely tracked this request. No exception was taken to that portion of the court's charge. Practice Book § 315. Even if that portion of the charge was erroneous, since it was induced by the defendant, he has no cause to complain. *State* v. *Cobbs,* 164 Conn. 402, 424, 324 A.2d 234, cert. denied, 414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112 (1973) ; see also *Velardi* v. *Selwitz,* 165 Conn. 635, 641, 345 A.2d 527 (1974). Generally, an erroneous charge induced by a party's request to charge does not entitle that party to a retrial. *State* v. *Cobbs,* supra; *Velardi* v. *Selwitz,* supra. Under the circumstances, in the absence of an exception, we will not review this claim further.

We now take up the defendant's claim that the court erred in its jury instruction on the defendant's interest in the outcome of the trial.[10] Although no exception was taken to this part of the instruction, the defendant claims that we should review this claim under the *State* v. *Evans,* 165 Conn. 61,

---

[10] The court charged as follows: "The defendant took the stand, even though he has a constitutional right not to testify. Again, you must examine his testimony the same as you do that of any other witness and when you consider his testimony, you are entitled to consider his evident interest in the outcome of this trial and his reasons, therefore, for telling the truth or for not telling the truth."

67, 327 A.2d 576 (1973), doctrine because this instruction placed "a penalty upon the defendant's decision to testify, and undermined his presumption of innocence." We have recently considered and rejected this same argument because such instructions do not implicate a fundamental constitutional right. *State* v. *Miller*, 186 Conn. 654, 443 A.2d 906 (1982); *State* v. *Kurvin*, 186 Conn. 555, 442 A.2d 1327 (1982). Therefore, we decline to review this claim of error.

The defendant's final claim of error is that the trial court erred by failing to instruct the jury that they might draw an adverse inference from the state's failure to call the victim's husband as a witness. We do not agree. The defendant did not file any request for the "Secondino charge"; *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960); but he did except to the court's failure to give that charge with reference to the victim's husband.[11]

The state called four other witnesses in addition to the victim. They were Mrs. Baccash, Officer Pucci, Detective Halapin and Dr. Gulash. These were the first four people she talked with after the incident. On the night before the incident, the victim's husband was in bed when the defendant arrived and he did not see the defendant or hear any of the discussion that night. When the defendant arrived at his home the next day, the victim's husband had already gone to work. He was also not present when the police questioned his wife, nor when she went to see Gulash. When she testified at the trial, the victim said she told her

---

[11] The defendant filed eleven written requests to charge.

husband what had happened. During cross-examination of the victim, defense counsel pointed out that the victim's husband was actually in the courtroom.

We have "established the criterion that '[t]he party claiming the benefit of the rule on the adverse inference [*Secondino* rule] must show that he is entitled to it.' That is, the party claiming the benefit of the ruling must show that the witness is available and that the witness is one whom the party would naturally produce." (Citations omitted.) *State* v. *Boyd,* 178 Conn. 600, 605, 424 A.2d 279 (1979). "When a witness is equally available to both parties no inference unfavorable to either may be drawn." *State* v. *Brown,* 169 Conn. 692, 705, 364 A.2d 186 (1975); *State* v. *Rosa,* 170 Conn. 417, 431, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976); see *Queen* v. *Gagliola,* 162 Conn. 164, 169, 292 A.2d 890 (1972). It is apparent that the victim's husband was equally available to both parties; in fact, he was in the courtroom. See *United States* v. *DeLutro,* 435 F.2d 255, 257 (2d Cir. 1970), cert. denied, 402 U.S. 983, 91 S. Ct. 1658, 29 L. Ed. 2d 148 (1971) (court properly refused unfavorable inference instruction for government's failure to call as witness in extortion case victim's brother, who was present at time of threatening conversation, as brother was equally available to defense); see also 2 Wigmore, Evidence (2d Ed.) §§ 287, 288. He also had no personal knowledge either of the defendant or of the incident. Cf. *United States* v. *Armone,* 363 F.2d 385, 404–405 (2d Cir.), cert. denied, 385 U.S. 957, 87 S. Ct. 398, 17 L. Ed. 2d 303 (1966) (court properly gave charge that where a witness to the transaction in question was in court and was not called to testify by the

prosecution or the defense, the jury could infer that his testimony might have been unfavorable to either party or draw no inference at all).

The evidence offered by the state was sufficient to sustain the jury's verdict without the testimony of the victim's husband. We can hardly say that, under the circumstances of this case, the state did not properly fulfill its duty to present all evidence tending to aid in ascertaining the truth, whether or not it be consistent with the state's claim of the defendant's guilt. See *State* v. *Moynahan,* 164 Conn. 560, 568, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973). There is significant authority for the well settled proposition that "the government is not required to call every witness who might be able to give some evidence about the crime." *United States* v. *Wolfson,* 322 F. Sup. 798, 822 (D. Del. 1971), aff'd, 454 F.2d 60 (3d Cir.), cert. denied, 406 U.S. 924, 92 S. Ct. 1792, 32 L. Ed. 2d 124 (1972); see *Ferrari* v. *United States,* 244 F.2d 132, 141–42 (9th Cir.), cert. denied sub nom. *Darneille* v. *United States,* 355 U.S. 873, 78 S. Ct. 125, 2 L. Ed. 2d 78 (1957); *Zammar* v. *United States,* 217 F.2d 223, 225–26 (8th Cir. 1954); *Deaver* v. *United States,* 155 F.2d 740, 743–44 (D.C. Cir.), cert. denied, 329 U.S. 766, 67 S. Ct. 121, 91 L. Ed. 659 (1946); *United States* v. *Whiteside,* 404 F. Sup. 261, 267 (D. Del. 1975).

There is no error.

In this opinion the other judges concurred.