STATE OF CONNECTICUT *v.* GARY OLIVER
(AC 15854)

O'Connell, C. J., and Lavery and Daly, Js.

Argued December 4, 1997—officially released March 10, 1998

*J. Brendan Sharkey*, special public defender, for the appellant (defendant).

*Ellen A. Jawitz*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James Dinnan*, assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, J. The defendant, Gary Oliver, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2),[1] and larceny in the second degree in violation of General Statutes § 53a-123 (a) (3).[2] On appeal, the defendant claims that the trial court improperly (1) refused to instruct the jury that it could draw an adverse inference from the state's failure to call a witness and (2) allowed the introduction of prejudicial evidence of previous misconduct on the part of the defendant. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At the time of the incident in question, the victim, Martin Leaks, was approximately sixty years old and unemployed. Leaks suffered from a disabling condition and received supplemental security income (SSI) in the amount of $400 per month and supplemental payments from the state in the amount of $300 per month. Leaks' SSI check arrived on the first of the month, and his supplemental check from the state arrived on the third of the month. Leaks testified that he occasionally used cocaine. He further testified that he had known the

---

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[2] General Statutes § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and . . . (3) the property, regardless of its nature or value, is taken from the person of another . . . ."

defendant for four to six months and that the defendant had sold him drugs at his apartment. As the result of their dealings, the defendant knew when Leaks received his checks.

On October 4, 1994, Leaks and his son, Rodney Boyd, were in Leaks' apartment at 5:30 or 5:45 p.m. when there was a knock at the door. Leaks asked who it was, and someone responded, "G." Because Leaks knew someone who went by G, Boyd opened the door. The defendant and three or four other men then entered the apartment. Leaks was sitting on a couch when the men entered. The defendant sat in a chair while the other men remained standing. The defendant then said to Leaks, "Pops, you got money?"[3] Leaks responded, "No, I don't have no money." One of the other men then said to the defendant, "G, search him, see if he got money." This same man had a gun in his hand and began looking around the apartment. Suddenly, Leaks noticed that the defendant "was back at the door." The man with the gun walked up to Leaks, looked at him, said, "Why are you smiling?" and shot him. The shooter then reached into Leaks' pockets and took his money and food stamps. The defendant, the shooter and the other men left the apartment through the back door. Leaks managed to get to a neighbor's apartment and called the police.

Officer Pasquale Marino arrived on the scene within minutes and found Leaks lying on the floor in front of the couch suffering from a gunshot wound to the hip. Leaks and Boyd gave Marino a description of one of the perpetrators and said the man's name was G. Also at the scene was Detective William Piascyk, who spoke to Boyd and requested that he accompany him to the police station. Boyd refused. Leaks was taken by ambulance to a hospital and treated for the gunshot wound.

---

[3] Leaks testified that his nickname is Pops.

Later that evening, Marino saw a man in the parking lot outside Leaks' apartment who matched the description provided by Leaks and Boyd. The man was later identified as the defendant. Marino asked the defendant if he went by the name of G and the defendant responded, "Some people call me that." Marino then asked the defendant if he knew anything about the earlier incident. The defendant replied that he had been there when Leaks was shot. The defendant was taken into custody and brought to the New Haven police station. After having been read his rights and having signed a waiver, the defendant gave an oral statement to the police.[4] The defendant gave the police a description of one of the men who was at Leaks' apartment, whom he referred to as Mike, and said that the shooter was "Mike's home boy."

I

The defendant first claims that the trial court improperly refused to deliver an adverse inference instruction in its jury charge regarding the state's failure to call as a witness the victim's son, Boyd. We are unpersuaded.

At trial, the defendant filed a proper request with the trial court seeking a charge to the jury as to Boyd as a missing witness pursuant to *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960). The trial court did not charge as requested and the defendant duly excepted.

"The failure to produce a witness for trial who is available and whom a party would naturally be expected

---

[4] The defendant's statement, as introduced by Marino, was as follows: "He [the defendant] stated he was there, he went to Pops' apartment, heard some arguing, somehow was let in, a couple of other subjects in there, one he knew just by first name and more argument continued and then there was a shot. . . . [H]e asked Pops if he had been shot, and Pops told him no, so he said I'll check on you later and he leaves."

to call warrants an adverse inference instruction against the party who would be expected to call that witness. . . . An inquiry into the appropriateness of a *Secondino* instruction is, accordingly, two-pronged: whether the witness is available and whether, under the facts of this case, the witness is one whom the state would naturally be expected to produce." (Citations omitted; internal quotation marks omitted.) *State* v. *Wood*, 208 Conn. 125, 140, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988). "A witness who would naturally be produced by a party is one who is known to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce." *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 675.

"This court has consistently held that [w]hether an absent witness has superior or peculiar information and whether an adverse inference can be drawn is a question of fact for the trier. *Perl* v. *Case*, 3 Conn. App. 111, 115, 485 A.2d 1331 [cert. denied, 195 Conn. 803, 491 A.2d 1103] (1985). This court cannot reverse or modify the trial court's determinations of fact unless they are clearly erroneous. *Buddenhagen* v. *Luque*, 10 Conn. App. 41, 44, 521 A.2d 221 (1987). *State* v. *Williams*, 20 Conn. App. 263, 266, 565 A.2d 1365 (1989)." (Internal quotation marks omitted.) *State* v. *Jurgensen*, 42 Conn. App. 751, 758, 681 A.2d 981, cert. denied, 239 Conn. 931, 683 A.2d 398 (1996).

"To take advantage of this rule permitting an adverse inference, the party claiming the benefit must show that he is entitled to it." (Internal quotation marks omitted.) *State* v. *Rosa*, 170 Conn. 417, 431, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976). "That is, the party claiming the benefit of the

ruling must show that the witness is available and that the witness is one whom the party would naturally produce." (Internal quotation marks omitted.) *State* v. *Kish*, 186 Conn. 757, 771, 443 A.2d 1274 (1982). "[T]he trial court must make a preliminary determination that there is evidence in the record to support these elements." *Hines* v. *St. Vincent's Medical Center*, 232 Conn. 632, 638, 657 A.2d 578 (1995).

In denying the defendant's request, the trial court stated that "the evidence in the case of his apparent noncooperation with the police in connection with the investigation into this crime . . . causes the court to conclude that he is not a witness that naturally the state would produce."[5] When initially questioned, Boyd gave an oral statement to Marino. Boyd then refused to cooperate further when Piascyk requested that he come to the police station to give a formal statement and to look at some photographs.[6]

---

[5] The trial court stated in full: "In connection with the various requests to charge, I indicated to counsel in chambers that the defense request of the *Secondino* request, which is number two, failure to call witness, my recollection of the evidence with respect to the availability of Rodney Boyd does not satisfy the need to establish that he is available as a witness. And, in addition, the evidence in the case of his apparent noncooperation with the police in connection with the investigation into this crime raises—causes the court to conclude that he is not a witness that naturally the state would produce. If the defense wishes to produce [him, it] could, but I don't think that the state is under that burden for the reasons I just indicated. Therefore, there will be no reference to the absence of Rodney Boyd from this proceeding . . . ."

[6] On direct examination, Marino testified as follows:

"Q. While at the scene, did you ask Martin Leaks, the gentleman who received the gunshot wound, what had happened to him?

"A. Yes, I did.

"Q. Okay. And did he—did you ask anybody else about what occurred?

"A. Yeah, his son, Rodney Boyd.

"Q. Okay. Based on your questioning—strike that. Did Martin Leaks give you a physical description of one of the persons involved in this incident?

"A. Yes, he did.

"Q. Okay. And did Rodney Boyd also give you a physical description of one of the persons involved in this incident?

In reviewing a trial court's findings of fact, we are governed by the clearly erroneous standard of review. "A finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Strickland,* 42 Conn. App. 768, 773, 682 A.2d 521 (1996), rev'd on other grounds, 243 Conn. 339, 703 A.2d 109 (1997).

Upon our review of the entire record, we cannot say that the trial court's determination that Boyd was uncooperative with the police and, therefore, someone unlikely to be a good witness for the state or a witness whom the state would naturally produce is clearly erroneous. The trial court's decision not to deliver the *Secondino* instruction was, therefore, not an abuse of

"A. Yes.

"Q. Okay. Based on the—did they also give you a name or a nickname?

"A. Yes."

On direct examination, Piascyk testified as follows:

"Q. Do you recall, officer, speaking to one Rodney Boyd?

"A. Yes, sir. I spoke to Rodney Boyd.

"Q. Okay. Did you request that Mr. Boyd accompany you to the police department?

"A. Yes, sir, I did.

"Q. And what was the reason for requesting that?

"A. I wanted to get a formal statement from him, maybe have him get some photographs.

"Q. And did he agree to do that?

"[Defense Counsel]: Objection, Your Honor. Objection, Your Honor.

"[Piascyk]: No, he refused.

"[Defense Counsel]: I'll withdraw the objection, Your Honor.

"The Court: Go ahead.

"Q. He never gave a formal statement?

"A. No, sir, he did not.

"Q. And he never looked at any photographs?

"A. No, sir, he did not.

"Q. And that was his decision?

"A. Yes, sir."

discretion. Because we agree with the trial court's determination as to the second prong for determining the appropriateness of a *Secondino* charge, we do not address the defendant's claim respecting availability.

## II

The defendant next claims that the trial court improperly admitted evidence that he had a drug dealing relationship with Leaks. The defendant argues that the prejudicial impact of this testimony clearly outweighs its limited probative value. We disagree.

Prior to the commencement of trial, the state sought to present testimony that the defendant had sold narcotics to Leaks during the four to five month period prior to the shooting. The trial court, after hearing arguments concerning the admissibility of the proffered testimony, allowed it into evidence.[7]

---

[7] The trial court stated: "What [the assistant state's attorney] wants to do is offer [evidence of the drug dealing relationship] to show that they did have a business relationship, which caused this defendant, according to the state, to know, based on their prior dealings and what went on, that at the beginning of the month, this victim, alleged victim, had funds and that they infrequently engaged in this business transaction at the beginning of the month when he had plenty of funds, that then gets into the knowledge of that fact with the defendant, which leads to why he was allegedly selecting that time frame to show up to do whatever he intended to do, whatever was done. . . ." After asking counsel the location of the incident in question, the trial court further stated: "This jury is going to speculate that this was all about drugs anyway, that's what they are going to speculate. And I think in this day and age, the jury can be suitably instructed with the fact that this defendant may have in the past been involved in drug dealings and that this victim, for that matter, was involved in drug dealings because he was engaged in just as much of an illegal activity as the defendant was. It's not the issue of this case. The defendant is not charged with anything to do with narcotics. It's merely offered as an explanation as to how the defendant was aware that this victim allegedly would have these funds at the beginning of the month, and based on their prior dealings, that's the only purpose of the offer, and I think they could be suitably instructed. And I do not believe that in today's society this jury is going to hold that evidence against any defendant in judging his guilt on an assault case. Therefore, the evidence will come in."

Leaks then testified that he had known the defendant for four to six months prior to the shooting and that he knew the defendant because the defendant sold drugs to him. He further testified that the defendant knew that he received his disability checks on the first and third of each month. The only evidence of the defendant's drug dealing came in through this testimony by Leaks.

As part of its charge to the jury, the trial court gave a limiting instruction as to the jury's consideration of this evidence. The court informed the jury that the testimony was to be used only for the purposes for which it had been admitted, that is, as some evidence that the drug dealing relationship enabled the defendant to know when Leaks would have money in his apartment, and as some evidence relevant to the defendant's motive when he entered Leaks' apartment on October 4, 1994.[8] Further, the trial court reminded the jury that the defendant was not charged with any drug related offense.

"As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. *State* v. *Crumpton*, 202 Conn. 224, 228, 520 A.2d 226 (1987); *State* v.

---

[8] The trial court stated: "Now, during the course of the trial, Mr. Leaks testified that he knew the defendant, who he said had the nickname G, I believe, because the defendant used to come to his apartment previously to sell him drugs and that this was how the defendant knew that Mr. Leaks received certain checks at the beginning of each month and, therefore, would have money in the apartment early in the month. Now, that evidence was not offered to prove that the defendant was a drug dealer and that if he is a drug dealer that he must be a bad person and, therefore, he must be guilty of robbery and larceny as charged in this case. That's not the purpose of that evidence. The only purpose for which that was offered was a claim by the state that it was that relationship that enabled the defendant to know when Mr. Leaks would have money in his apartment and that it tends to show what the motive was when the defendant and the people allegedly with the defendant came to the apartment on October 4, 1994. Please remember this defendant is not charged with any narcotics offense, any drug charges. And if you should find that he may have been involved previously in selling drugs to Mr. Leaks, it is to be considered by you only for the limited purpose that I just indicated."

*Geyer*, 194 Conn. 1, 5, 480 A.2d 489 (1984). We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. *State* v. *Mooney*, 218 Conn. 85, 126, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); *State* v. *Brown*, 199 Conn. 47, 56, 505 A.2d 1225 (1986); *State* v. *Ibraimov*, 187 Conn. 348, 352, 446 A.2d 382 (1982). [Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. *United States* v. *Everett*, 825 F.2d 658, 660 (2d Cir. 1987), cert. denied, 484 U.S. 1069, 108 S. Ct. 1035, 98 L. Ed. 2d 999 (1988) . . . . *State* v. *Santiago*, 224 Conn. 325, 338, 618 A.2d 32 (1992); *State* v. *Duntz*, 223 Conn. 207, 240, 613 A.2d 224 (1992). . . .

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. *State* v. *Brown*, supra, [199 Conn.] 56. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. *State* v. *Braman*, 191 Conn. 670, 676, 469 A.2d 760 (1983); *State* v. *Shindell*, 195 Conn. 128, 134, 486 A.2d 637 (1985)." (Internal quotation marks omitted.) *State* v. *Cooper*, 227 Conn. 417, 424–25, 630 A.2d 1043 (1993).

The defendant argues that the drug dealing evidence does not fall into any of the recognized exceptions to the nonadmissibility rule, and that the evidence is more prejudicial than probative. The defendant concedes that proof of motive is a recognized exception, but argues that in this case the evidence was not offered to show motive for the crime because the crime charged did not involve drugs.

The trial court could reasonably have concluded that the evidence of the defendant's drug dealing relationship with Leaks was relevant and material because it showed that the defendant knew Leaks personally, knew where he lived, had been a visitor at Leaks' apartment in the past and knew when Leaks received his monthly checks. This evidence was relevant in establishing the defendant's motive when he brought the other men to Leaks' apartment on October 4, 1994. In addition, it showed that the defendant had special knowledge that would assist him in the execution of the crime, specifically, when Leaks would have the most money to steal. See *State* v. *Jones*, 215 Conn. 173, 188, 575 A.2d 216 (1990).[9] The trial court did not abuse its discretion in concluding that the evidence of the defendant's drug dealing relationship with Leaks was relevant to show the defendant's motive in the performance of the crime.

The next issue to be determined is whether the trial court abused its discretion in admitting the evidence of the defendant's drug dealing relationship with Leaks. "The standard for review is clear. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Cooper*, supra, 227 Conn. 426–27.

A trial court's admission of evidence that a defendant previously engaged in drug related activity is not necessarily prejudicial. See, e.g., id., 425–27; *State* v. *Ryan*,

[9] In *State* v. *Jones*, supra, 215 Conn. 173, the defendant was on trial for kidnapping a woman in a park. The defendant's statement that he was a drug addict and had used drugs in the same park where the kidnapping occurred was relevant and probative because it showed "the defendant's knowledge that the area was not patrolled by the police." Id., 188–89.

182 Conn. 335, 338, 438 A.2d 107 (1980); *State* v. *Harris*, 43 Conn. App. 830, 837, 687 A.2d 544 (1996); *State* v. *Jenkins*, 24 Conn. App. 330, 335–36, 588 A.2d 648, cert. denied, 219 Conn. 903, 593 A.2d 132 (1991). In this case, any prejudicial effect was minimized because the only reference to the defendant's drug dealing relationship with Leaks was during the course of Leaks' direct examination. The trial court's limiting instruction as to the proper use of this evidence also mitigated any prejudicial effect. See *State* v. *Cooper*, supra, 428; *State* v. *Ryan*, supra, 338 n.5. In addition, any potential prejudice was further reduced because the defendant was not charged with a drug related offense. See *State* v. *Cooper*, supra, 427.

Accordingly, we conclude that the trial court did not abuse its discretion in admitting evidence of the defendant's prior misconduct, as this evidence was indeed more probative than prejudicial.

The judgment is affirmed.

In this opinion the other judges concurred.