## STATE OF CONNECTICUT *v.* DAVID MOONEY
## (13737)

PETERS, C. J., SHEA, CALLAHAN, GLASS, COVELLO, BORDEN and SANTANIELLO, Js.[1]

---

[1] This case was orally argued on October 2, 1990, before a panel of this court consisting of Chief Justice Peters and Justices Shea, Covello, Borden and Santaniello. Subsequently, the court determined that the case was appropriate for en banc consideration. Justices Callahan and Glass were added to the panel and considered the case upon full review of the record, briefs and transcript of the October 2, 1990 oral argument.

Argued October 2, 1990—decision released March 19, 1991

*Emanuel Margolis* and *Bruce D. Koffsky,* special public defenders, with whom, on the brief, was *Edward V. O'Hanlan,* for the appellant (defendant).

*Judith Rossi,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, *Roland Fasano,* former assistant state's attorney, and *Michael Granston,* legal intern, for the appellee (state).

BORDEN, J. The dispositive issue of this appeal is whether, under the fourth amendment to the United States constitution, the defendant had a reasonable expectation of privacy in certain closed containers located in the area under a highway bridge abutment where he was living. The defendant appeals from the judgment of conviction, after a jury trial, of felony mur-

der in violation of General Statutes § 53a-54c,[2] and robbery in the first degree in violation of General Statutes § 53a-134 (a) (1).[3] He claims that the trial court improperly: (1) denied his motion to suppress certain evidence gathered as a result of a search and seizure of certain personal property located under the bridge abutment where he had been living; (2) denied his motion to dismiss for lack of a speedy trial; (3) admitted into evidence certain testimony about a larceny he allegedly committed subsequent to the murder and robbery; and (4) denied him access to the mental health records of a state's witness. We conclude that the trial court should have granted the motion to suppress, and we reverse the judgment.

The jury could reasonably have found the following facts. The defendant owed money to Mark Allen[4] for

---

[2] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[3] "[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime . . . ."

[4] Allen was tried separately from the defendant as an accomplice. We recently affirmed his conviction of the crimes of felony murder, robbery

drugs. On July 30, 1987, the defendant, who was driving the car of the victim, a male homosexual, took Allen to the victim's condominium in Branford in order to pay his debt to Allen by stealing the victim's video cassette recorder and other items. The defendant told Allen that he and the victim had a homosexual relationship, and that Allen should pretend that he was interested in engaging in sex with the victim and the defendant. At the condominium, the three men had drinks and thereafter went upstairs, where the defendant and the victim took a shower together. After kissing and fondling the victim, the defendant began beating him. Allen, who had declined to become involved in the sexual activity, pulled the defendant off the victim, who was bleeding from his nose and mouth and had stopped moving. Allen then left the bedroom to search for items to steal. The defendant remained in the bedroom, where he strangled the victim with a cord. Allen left the condominium with a quantity of coins, the victim's video cassette recorder, and some other items. He stole the victim's car, leaving the defendant in the condominium with the victim.

On July 31, 1987, the victim's body was discovered on the floor of his bedroom, which was in disarray, with bloodstains in various locations throughout the room. The victim had been beaten, and had been strangled to death with a ligature.

On August 5, 1987, the police arrested Allen in connection with the murder and robbery. Allen gave several statements in which, although he denied involvement in the victim's death, he admitted being in the victim's condominium that day and stealing his video cassette recorder, his car, and other items. In his statements, Allen implicated the defendant in the murder of the victim. On the basis of this information, the police

in the first degree and burglary in the first degree. See *State* v. *Allen,* 216 Conn. 367, 579 A.2d 1066 (1990).

secured an arrest warrant for the defendant and arrested him on the night of August 5, 1987.

## I

The defendant claims that the trial court improperly denied his motion to suppress certain evidence that the Branford police had seized from an area under a highway bridge abutment where the defendant had been living at the time of his arrest. This claim, divided into two parts, is that: (1) under the fourth amendment to the United States constitution,[5] the police violated his rights by invading his "home" under the bridge abutment without a warrant; and (2) the police violated those rights when, without a warrant, they seized his belongings, including a closed duffel bag and a closed cardboard box containing personal items, and searched them. We conclude that, on the facts presented here, the defendant had a reasonable expectation of privacy in the contents of his duffel bag and cardboard box. Accordingly, the warrantless search of his duffel bag and cardboard box by the police violated his fourth amendment rights and the evidence yielded by that search should have been suppressed.

The evidence produced at the hearing on the defendant's motion to suppress disclosed the following facts.

[5] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Although the defendant also claims that the search and seizure violated his rights under article first, § 7, of the Connecticut constitution, he offers no separate analysis thereunder. We therefore decline to consider his claim under the Connecticut constitution; *State* v. *Couture,* 194 Conn. 530, 572A–B n.2, 482 A.2d 300 (1984), cert. denied, 496 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); *Hayes* v. *Smith,* 194 Conn. 52, 480 A.2d 425 (1984); and confine our discussion to the federal constitution. Thus, we do not decide whether article first, § 7, affords our citizens broader reasonable expectations of privacy than does the fourth amendment.

Shortly after midnight on the morning of August 6, 1987, while the defendant was in custody, Detective Anthony Morro of the Branford police department met the defendant's girlfriend, Linda Spencer, at Friendly's Restaurant in West Haven, where she was employed. At Morro's request, Spencer told him that she would take him to the place where the defendant had been living at the time of the murder. Spencer directed Morro to a bridge abutment underneath the highway overpass by the State Street entrance ramp to route I-91 in New Haven. The abutment was separated from the entrance ramp roadway by a steep embankment that was covered by crushed stone and heavy underbrush. The state department of transportation owns the property involved.

Morro climbed up the embankment and, using a flashlight to illuminate the area, saw several items, including a blanket used as a mattress, a rolled-up sleeping bag, a closed cardboard box, a suitcase, a small closed duffel bag, and paper trash bearing the Friendly's Restaurant insignia. The defendant, using the metal and cement beams of the highway support structure as shelves, had placed all of his belongings on the beams, with the exception of the duffel bag, the blanket, and the trash, which were left on the ground. Morro opened the duffel bag and found therein a paper bag containing a large quantity of quarters. He did not open the other items at that time. Morro then called the Branford police department evidence officer to the scene. They photographed and tagged all of the items and brought them to the police department, where they were opened and "inventoried" by Sergeant William Carroll.[6] The cardboard box contained a size 38 belt,

---

[6] Although Carroll described the procedure performed at the police department as an "inventory" of the items, the state made no claim, either in the trial court or in this court, that the actions of the police came within the inventory exception to the warrant requirement. The state specifically

and the duffel bag contained approximately $700 in coins, mostly quarters, a pair of white pants stained with what was later determined to be blood, and several pieces of jewelry.[7]

The defendant asserted ownership of all the items taken by the police and their contents, except for the belt, which he claimed to have acquired when it had been left on a park bench by a woman with whom he had been drinking. Although the defendant had been living under the bridge abutment for about one month, he previously had been living in an apartment on Chapel Street in New Haven until the second or third week in June, 1987, when he moved out after an argument with his roommate. For approximately two weeks thereafter he lived beside a fence near the Trumbull Street entrance to I-91. He left that location when another homeless man started camping nearby, and moved to the State Street abutment area. He was still living under the bridge when he was arrested on August 5, 1987. While he was living there he had no other home.

---

disclaimed any such reliance at oral argument in this court because there was no evidence that Carroll's purported inventory of the items seized was pursuant to a "policy or practice governing inventory searches [that is] designed to produce an inventory." *Florida* v. *Wells,* 495 U.S. 1, 4, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990).

[7] Although not specifically mentioned at the suppression hearing, the trial transcript discloses that the police also seized a Nazi-type dagger and a bayonet from the bridge abutment area. Morro testified that these items were found *"in the belongings* which [he] recovered underneath the bridge." (Emphasis added.) He did not specify, however, *where* in those belongings they were found. We assume from this testimony, and from Morro's additional testimony, that the defendant's belongings were "either rolled or packaged closed," and that "[t]hey were stored" and "not strewn about at all," that these items were also located within one of the closed containers. This assumption is buttressed by the photographs of the bridge abutment area in evidence, which do not indicate the presence of the dagger or bayonet. Since a new trial is necessary, the state will be free to establish otherwise on the remand.

During the one month period of time that the defendant lived there, he was the only person occupying that space. Although he would leave the area every day, he would secure his belongings so that they could not be seen from the bottom of the embankment because he was worried about theft. At night, he slept there behind a bush. The defendant knew that the area was state property and that there was no reason why someone else could not enter or live in the area where he was living. In fact, the defendant acknowledged that, while he was living there, a highway worker clearing brush came upon him.

The trial court found that the defendant had manifested a subjective expectation of privacy in the items seized, but, because of their location, that his expectation was not reasonable. It also found, moreover, that "it would be reasonable to assume that someone could look at the items and assume that everything had been abandoned" and that the defendant had no reasonable expectation of privacy in the contents of the items because "[t]hey were left there for anyone to observe and for anyone to open." The court accordingly denied the motion to suppress.

At trial, several items found underneath the bridge abutment were presented to connect the defendant to the robbery and murder of the victim. The state introduced the white bloodstained pants and the size 38 belt into evidence. The pants linked the defendant directly to the death of the victim because Allen identified them as those worn by the defendant during the crimes. Evidence was also presented that the victim had a size 38 waist, thereby connecting the belt found in the defendant's cardboard box to the victim. The coins, the jewelry, the dagger and the bayonet; see footnote 7, supra; were introduced into evidence in order to link the defendant with a subsequent larceny from Charles C, another homosexual, who testified that the defend-

ant had stolen the items from him six days after the murder and robbery of the victim. The evidence regarding that larceny forms the basis of the defendant's third claim in this appeal.

## A

The defendant first makes the broad claim that the police violated his rights under the fourth amendment when, without a search warrant, they "invaded his home" under the abutment and seized items found there. The defendant argues that he had a legitimate expectation of privacy in the area where he was living that was protected from a warrantless search. Relying solely on his homelessness, he argues that he treated the space as his home, that he had exclusive possession since he was living there alone, and that he was no less entitled to privacy under the fourth amendment because he was homeless than are the more fortunate members of society.[8]

The state responds that the defendant had no reasonable expectation of privacy in the area in question. It argues that the area in question was not protected by the fourth amendment because: (1) it was in effect an open field; (2) the defendant was not legitimately residing there, but was an interloper on public land; and (3) it was an area accessible to the public at large, and thus was by its nature "incapable of sheltering a reasonable expectation of privacy."

---

[8] The defendant brings to our attention the fact that from October, 1987, through September, 1988, more than 18,000 persons received emergency shelter in Connecticut. Connecticut Coalition for the Homeless Shelter Population Statistics—Oct., 1987–Sept., 1988 (Update Dec. 1989). That figure does not include homeless people living in places other than shelters, such as motels, the homes of family or friends, or out of doors. Id. Other estimates of the number of homeless in our midst range from two hundred thousand to two million. J. Langdon & M. Kass, "Homelessness in America: Looking for the Right to Shelter," 19 Colum. J.L. & Soc. Probs. 305, 305 n.1 (1985).

We need not decide in this case whether the defendant had a reasonable expectation of privacy in the bridge abutment area. We assume for purposes of this decision that the state is correct that the defendant's broad claim of fourth amendment protection in the area involved must fail.[9] We conclude, nonetheless, that the defendant's alternate, more narrow claim—that he had a reasonable expectation of privacy in his duffel bag and cardboard box located there—has merit.

### B

The application of the fourth amendment prohibition against unreasonable searches and seizures requires the defendant to establish that he had a legitimate expectation of privacy in the invaded area. *State* v. *Reddick,* 207 Conn. 323, 330, 541 A.2d 1209 (1988). "Absent such an expectation, the subsequent police action has no constitutional ramifications." *State* v. *Brown,* 198 Conn. 348, 355, 503 A.2d 566 (1986). The determination of whether such an expectation exists is to be made on a case by case basis; *State* v. *Reddick,* supra, 331; and requires a two-part inquiry: "first, whether the individual has exhibited an actual subjective expectation of privacy, and second, whether that expectation is one society recognizes as reasonable." Id. Whether a defendant's actual expectation of privacy in a particular place is one that society is prepared to recognize as reasonable involves "a fact-specific inquiry into all the relevant circumstances." *State* v. *Brown,* supra, 356. Although "the Fourth Amendment protects people, not places"; *Katz* v. *United States,* 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); the place searched is highly relevant to the fourth amendment

---

[9] For these purposes, we accept the defendant's claim that he sufficiently manifested a subjective expectation of privacy in the area and in the items seized to satisfy the first prong of the applicable fourth amendment analysis. The trial court so concluded, and the state does not seriously contend otherwise.

analysis because "expectations of privacy in some places are afforded greater constitutional legitimacy than in others." *State* v. *Brown,* supra; *United States* v. *Ruckman,* 806 F.2d 1471, 1473 (10th Cir. 1986) (determination of protection of fourth amendment requires, in given case, reference to place; defendant had no reasonable expectation of privacy in cave, located on public land, where he lived); see also *Rakas* v. *Illinois,* 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979) (capacity to claim protection of fourth amendment depends "upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place"). Indeed, some places, such as the open fields, afford no legitimate expectation of privacy. *Oliver* v. *United States,* 466 U.S. 170, 176, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984).

The determination that a particular place is protected under the fourth amendment requires that it be one "in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy." *United States* v. *Taborda,* 635 F.2d 131, 138 (2d Cir. 1980). It must be "one that society is prepared to recognize as 'reasonable.' " *Katz* v. *United States,* supra, 361 (Harlan, J., concurring). Legitimate expectations of privacy derive from "concepts of real or personal property law or [from] understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." *Rakas* v. *Illinois,* supra, 144 n.12. Of course, one need not have an "untrammeled power to admit and exclude" in order

to claim the protection of the fourth amendment, so long as the place involved is one affording an expectation of privacy that society regards as reasonable. *Minnesota* v. *Olson,* 495 U.S. 91, 99–100, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990) (overnight guest has reasonable expectation of privacy in host's home). Under some circumstances, the determination of whether an expectation of privacy is reasonable involves a balancing of interests. *Hudson* v. *Palmer,* 468 U.S. 517, 527, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) (no reasonable expectation of privacy in prison cell because society's interest in security of penal institutions outweighs prisoner's interest in privacy within his cell).

The courts have identified a number of factors indicating that a person's expectation of privacy in a particular place is one that society is not prepared to recognize as reasonable. Where the person occupying the property is a trespasser, ordinarily he has no reasonable expectation of privacy in that place. *United States* v. *Ruckman,* supra; *Amezquita* v. *Hernandez-Colon,* 518 F.2d 8, 11 (1st Cir. 1975), cert. denied, 424 U.S. 916, 96 S. Ct. 1117, 47 L. Ed. 2d 321 (1976); see also *Rakas* v. *Illinois,* supra, 143–44 n.12 (wrongful presence on property gives rise to no reasonable expectation of privacy). Furthermore, leaving one's property in an area "readily accessible to animals, children, scavengers, snoops, and other members of the public" may render one's expectation of privacy less than reasonable. *California* v. *Greenwood,* 486 U.S. 35, 40, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988) (no reasonable expectation of privacy in garbage bags, or their contents, left for collection outside curtilage of home). "Hence, '[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.' " Id., 41, quoting *Katz* v. *United States,* supra, 351. The rationale for this factor is that when a person leaves his property within

reach of the public generally, it is pointless to exclude the police alone, for that "would impede effective law enforcement while adding little to the individual's interest in privacy." *United States* v. *Most,* 876 F.2d 191, 198 (D.C. Cir. 1989).

We acknowledge, however, as stated by the dissent in *United States* v. *Ruckman,* supra, that factors such as whether the defendant was a trespasser and whether the place involved was public "are, of course, relevant as helpful guides, but should not be undertaken mechanistically. They are not ends in themselves; they merely aid in evaluating the ultimate question in all fourth amendment cases—whether the defendant had a legitimate expectation of privacy, in the eyes of our society, in the area searched." Id., 1476 (McKay, J., dissenting).

With these guidelines in mind, we turn, then, to the defendant's alternate claim, namely, that the police violated his fourth amendment rights when they searched his duffel bag and cardboard box at the scene and subsequently at the police station. The defendant relies principally on the well established propositions that, absent certain exceptions not applicable here, an individual, by placing his personal effects inside luggage or other appropriate closed containers,[10] manifests an

---

[10] The cases referring to those closed containers protected by the fourth amendment clearly indicate that both the duffel bag and the cardboard box in this case qualify for such protection. In *Robbins* v. *California,* 453 U.S. 420, 426–27, 101 S. Ct. 2841, 69 L. Ed. 2d 744 (1981), a plurality of the court stated that "[o]nce placed within a [closed, opaque] container, a diary and a dishpan are equally protected by the Fourth Amendment," and that "no court, no constable, no citizen, can sensibly be asked to distinguish the relative 'privacy interests' in a closed suitcase, briefcase, portfolio, duffel bag, or box." The fourth amendment does not distinguish between such containers, because "[w]hat one person may put into a suitcase, another may put into a paper bag." Id., 426. The only exceptions to this were, in the plurality's view, those containers that could not support a reasonable expectation of privacy because their contents could be inferred from their outward appearance, or because the container was transparent "or other-

expectation of privacy that the contents will remain free from public inspection, and that police intrusion into such containers ordinarily requires a warrant. See *Arkansas* v. *Sanders,* 442 U.S. 753, 765, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979); *United States* v. *Chadwick,* 433 U.S. 1, 11, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977). The defendant also argues that the trial court misapplied the doctrine of abandonment in ruling that the police were not required to obtain a warrant before searching his belongings.

The state argues, however, that the defendant did not retain a reasonable expectation of privacy in his luggage that he left under the bridge abutment. It asserts that the trial court properly determined that he abandoned any reasonable expectation of privacy in those goods by leaving them in a place accessible to the public, and that he "could not reasonably expect that his possessions would remain shielded from the curiosity of passersby or from the scrutiny of the police." The state also contends that, since the police would have been entitled to search the articles when they were found, their removal to the police station for a more thorough search was equally valid.

We conclude that, although this claim presents a close question, the defendant did have a reasonable expectation of privacy in the contents of his duffel bag and box that was violated by their warrantless search.

We first note that this narrow claim of the defendant, unlike his broad claim to a protected expectation

wise clearly revealed its contents." Id., 427. Thereafter, a majority of the court explicitly rejected "a constitutional distinction between 'worthy' and 'unworthy' containers" because "the central purpose of the Fourth Amendment forecloses such a distinction." *United States* v. *Ross,* 456 U.S. 798, 822, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982). "A paper bag stapled shut and marked 'private' might be found to manifest a reasonable expectation of privacy, as could a cardboard box stacked on top of two pieces of heavy luggage." Id., 822 n.30.

of privacy in the bridge abutment area, rests on an understanding that is generally recognized and permitted by society; *Rakas* v. *Illinois,* supra, 144 n.12; namely, the general understanding that the contents of luggage and other closed containers are entitled to remain private. We also note that, unlike the defendant's first claim, this claim does not rest solely on his homelessness. That is but one factor among several, the principal ones being the nature of the containers searched and the circumstances surrounding their search.

This claim requires us to confront a tension in the reasonable expectation of privacy jurisprudence of the fourth amendment that is not easily resolved. That tension is between, on one hand, the deference ordinarily afforded to expectations of privacy in luggage and other appropriate closed containers and, on the other hand, the proposition that property left by persons in open fields or public places may not command fourth amendment protection. We conclude that, under the facts of this case, that tension must be resolved in favor of the deference afforded to closed containers.

It is useful to note at the outset of this discussion the precise contours of what this claim does not involve, and what we do not decide with respect to it. We are not concerned with a claim of a reasonable expectation of privacy in any goods or effects of the defendant other than his duffel bag and his cardboard box, because only the search of those closed containers yielded evidence that was introduced against the defendant in this case. We are not concerned, moreover, with the legitimate expectation of privacy that a homeless person living out of doors has with respect to his goods and effects that he has with him or under his immediate control. Indeed, *Oliver* v. *United States,* supra, 179 n.10, makes clear that even one who enters an open field retains

the protection of the fourth amendment against unreasonable searches and seizures of such goods and effects.

We do not decide, moreover, whether the fourth amendment protects the goods and effects of all homeless persons, regardless of their particular circumstances. Those claims will have to await their assertion in light of their own factual contexts. Furthermore, we assume that the police were entitled to *seize* the defendant's duffel bag and cardboard box upon probable cause to believe that they contained evidence,[11] and to preserve them while a proper search warrant was secured. See *United States* v. *Jacobsen,* 466 U.S. 109, 115, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984); *United States* v. *Chadwick,* supra. We also do not decide under what circumstances the police may open a closed container that they come upon in a public place for purposes other than searching for evidence, such as preserving its safety or determining its ownership. See *Unites States* v. *Sumlin,* 909 F.2d 1218 (8th Cir.), cert. denied, U.S. , 111 S. Ct. 559, 112 L. Ed. 2d 566 (1990) (defendant's expectation of privacy in stolen handbag not violated when police opened bag to determine its ownership).

What this claim does involve, however, is whether the fourth amendment applies to the unique factual circumstances of this case, where the closed containers were found by the police in a secluded place that they knew the defendant regarded as his home,[12] where the

---

[11] Because the trial court decided that the fourth amendment did not apply, it had no occasion to consider the issue of probable cause. Therefore, that issue is not before us on appeal.

[12] Although we have assumed in Part IA of this opinion that the defendant had no reasonable expectation of privacy for fourth amendment purposes in the area under the bridge abutment, even though he regarded it as his home, the facts that he did so regard it, that it was secluded, and that he did in rough-hewn fashion maintain it as such, do inform the quite different determination of whether his privacy interest in the interior of closed containers located there was retained in his absence. Similarly, the

defendant's absence from that place at the time of the search was due to his arrest and custody by the police, and where the purpose of the search was to obtain evidence of the crimes for which he was in custody.[13]

same facts inform the issue of whether such luggage may fairly be regarded as "abandoned" for purposes of the fourth amendment. See text, infra.

[13] The inventory search cases; *Florida* v. *Wells,* 495 U.S. 1, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990); *Colorado* v. *Bertine,* 479 U.S. 367, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987); teach that under some circumstances the purpose of a search is relevant to the degree of protection afforded by the fourth amendment. More specifically, the balancing test employed in the jail cell case; *Hudson* v. *Palmer,* 468 U.S. 517, 527, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984); teaches that under appropriate circumstances the purpose of a search is relevant to the question of whether a defendant's subjective expectation of privacy is reasonable under the fourth amendment. See also *Amezquita* v. *Hernandez-Colon,* 518 F.2d 8, 12 n.7 (1st Cir. 1975), cert. denied, 424 U.S. 916, 96 S. Ct. 1117, 47 L. Ed. 2d 321 (1976) (fourth amendment constraints on government as law enforcer may be greater than as landowner); *Biehunik* v. *Felicetta,* 441 F.2d 228, 231 (2d Cir.), cert. denied, 403 U.S. 932, 91 S. Ct. 2256, 29 L. Ed. 2d 711 (1971) (administrative purpose, rather than criminal investigatory purpose, of seizure relevant to its reasonableness); *United States* v. *Hagarty,* 388 F.2d 713, 717–18 (7th Cir. 1968) (whether purpose of search is for criminal investigation or administrative purpose is relevant to scope of fourth amendment protection). Thus, the purpose of the police invasion may shape the determination of the reasonableness of an expectation of privacy.

We disagree with the dissent's suggestion that *California* v. *Ciraolo,* 476 U.S. 207, 106 S. Ct. 1809, 90 L. Ed. 2d 210, reh. denied, 478 U.S. 1014, 106 S. Ct. 3320, 92 L. Ed. 2d 728 (1986), and *Scott* v. *United States,* 436 U.S. 128, 98 S. Ct. 1717, 56 L. Ed. 2d 168, reh. denied, 438 U.S. 908, 98 S. Ct. 3127, 57 L. Ed. 2d 1150 (1978), have completely foreclosed any inquiry into the purpose of a search in determining whether a defendant's expectation of privacy in luggage is reasonable. In *Ciraolo,* the court held that, in determining whether the defendant had a reasonable expectation of privacy in the marijuana growing in his fenced-in back yard, it was irrelevant that the police who flew over his yard and observed the contraband did so for criminal investigative purposes rather than as part of a routine patrol. *California* v. *Ciraolo,* supra, 213–14. The court did not decide, however, that, had the defendant's closed backpack also been observed in the yard from the police airplane, the police would have been likewise entitled to seize and search it—a question more analogous to this case.

In *Scott,* the court did hold that, in determining the reasonableness of a search under the fourth amendment, the officer's actions must be viewed objectively. That case did not involve, however, the issue in this case, namely, whether the defendant retained a reasonable expectation of privacy in the

We begin with an analysis of the so-called luggage or closed container cases. Traditionally, great deference has been afforded under the fourth amendment to the expectation of privacy in luggage or closed containers. By placing personal effects inside a piece of luggage, one "manifest[s] an expectation that the contents would remain free from public examination. No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions in this manner is due the protection of the Fourth Amendment Warrant Clause." *United States* v. *Chadwick,* supra, 11. "Luggage contents are not open to public view, except as a condition to a border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis . . . . [L]uggage is intended as a repository of personal effects." Id., 13.

The *Chadwick* decision also made clear that it is the contents or interior of luggage or closed containers in which a reasonable expectation of privacy may inhere, not the visible exterior or location of the containers. "Respondents' principal privacy interest in the footlocker was, of course, not in the container itself, which was exposed to public view, but in its contents. A search of the interior was therefore a far greater intrusion into

interior of his luggage. *Scott* v. *United States,* supra, 137–38. We believe that the inventory and jail cell search cases noted above, where the purpose of the search *was* considered, have limited to some extent the sweep of *Scott.* See also *United States* v. *Sumlin,* 909 F.2d 1220 (8th Cir.), cert. denied,      U.S.    , 111 S. Ct. 559, 112 L. Ed. 2d 566 (1990), which postdates both *Ciraolo* and *Scott,* where the court held that the noninvestigatory purpose of the police in opening the defendant's stolen handbag was pertinent to whether the defendant's expectation of privacy therein was violated.

Although the trial court made no finding, at the time of the suppression ruling, regarding the purpose of the search of the defendant's duffel bag and cardboard box, Morro testified at trial that he took the items into custody because he "believed at that time there might have been evidence which would have been connected to the victim."

Fourth Amendment values than the impoundment of the footlocker. Though surely a substantial infringement of respondents' use and possession, the seizure did not diminish respondents' legitimate expectation that the footlocker's contents would remain private." Id., 13–14 n.8. In a different but closely related context the United States Supreme Court has stated: "A container which can support a reasonable expectation of privacy may not be searched, even on probable cause, without a warrant. See *United States* v. *Ross,* 456 U.S. [793, 809–12, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982)]; *Robbins* v. *California,* 453 U.S. [420, 426–27, 101 S. Ct. 2841, 69 L. Ed. 2d 744 (1981)] (plurality opinion); *Arkansas* v. *Sanders,* 442 U.S., at 764–765; *United States* v. *Chadwick,* 433 U.S. 1 (1977)." *United States* v. *Jacobsen,* supra, 120 n.17 (package entrusted to possession of private carrier). "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable. Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package." Id., 114. Moreover, "[t]he reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." Id., 115.

This case law leads us to conclude that, although the United States Supreme Court has not specifically articulated the principle as such, the fourth amendment focus on the place invaded, when applied to luggage or other appropriate closed containers, refers to their interior or contents. Thus, although the inquiry in determining whether there is a reasonable expectation of privacy involves an inquiry into the particular place

invaded, when the search is of a piece of luggage the principal "place" for fourth amendment purposes is the interior of the luggage and its contents.[14]

The genesis of the closed container cases lies in *Ex Parte Jackson*, 96 U.S. 727, 24 L. Ed. 877 (1878), in which the United States Supreme Court held that sealed packages in the mail cannot be opened without a warrant. See *Walter* v. *United States*, 447 U.S. 649, 653, 100 S. Ct. 2395, 65 L. Ed. 2d 410 (1980). The court reaffirmed *Jackson* in *United States* v. *Van Leeuwen*, 397 U.S. 249, 90 S. Ct. 1029, 25 L. Ed. 2d 282 (1970). Then, in *Chadwick*, the court struck down a warrant-less search of a locked footlocker that was seized from an automobile contemporaneously with the arrest of the defendants, as they were in the process of loading the footlocker into their automobile. *United States* v. *Chadwick*, supra, 4. The court held that although the police may have been justified in seizing the footlocker upon probable cause to believe that it contained contraband, the defendants' reasonable expectation of privacy in its contents rendered invalid the warrant-less search of it one hour later while it was in the exclusive control of the police. Id., 15.

Subsequently, in *Arkansas* v. *Sanders*, supra, the court reaffirmed *Chadwick* and invalidated a warrant-less search of a suitcase that the defendant had placed in the trunk of the taxi in which he was the passenger. The court stated: "Where—as in the present case—

[14] This does not mean, however, that the nature and circumstances of the location of the container are irrelevant. As we noted earlier, although the fourth amendment protects people not places; *Katz* v. *United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); the place searched is relevant for fourth amendment purposes. Thus, even closed containers, like the trash bags involved in *California* v. *Greenwood*, 486 U.S. 35, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988), may not carry a reasonable expectation of privacy when placed outside the curtilage for collection. Similarly, as discussed below, a closed container may, under appropriate circumstances, be regarded as abandoned for fourth amendment purposes.

the police, without endangering themselves or risking loss of the evidence, lawfully have detained one suspected of criminal activity and secured his suitcase, they should delay the search thereof until after judicial approval has been obtained." Id., 766. Similarly, in *State* v. *Edwards,* 214 Conn. 57, 570 A.2d 193 (1990), this court held that the defendant had a reasonable expectation of privacy in his backpack that was located in an apartment where he was temporarily residing, and that the consent of the lessee of the apartment to search the apartment could not vitiate that expectation. We held that it is not necessary " 'that a person assertively clutch an object in order to retain the protection of the fourth amendment' "; id., 75, quoting *United States* v. *Thomas,* 864 F.2d 843, 846 (D.C. Cir. 1989); and that the defendant had a justifiable expectation of privacy that his personal effects inside his backpack would remain private. *State* v. *Edwards,* supra.

Although the closed container cases in which a right of privacy had been found could be read broadly in conclusive support of the defendant's position in this case, and although they have on occasion been cited for the broad proposition that where "the automobile exception is inapplicable, police may not conduct a warrantless search of any container that conceals its contents"; *California* v. *Greenwood,* supra, 47 n.1 (Brennan and Marshall, Js., dissenting); a close reading of those cases indicates that they do not resolve the issues in this case. Rather, that line of cases involves situations where the owner or possessor of the container, at the time of his arrest, was carrying or was accompanied by the container; see, e.g., *Arkansas* v. *Sanders,* supra (suitcase in trunk of defendant's taxi); *United States* v. *Chadwick,* supra (defendants loading footlocker in trunk of

car);[15] where the owner or possessor had entrusted them to someone else for safekeeping or for a particular purpose; see, e.g., *United States* v. *Jacobsen,* supra (private freight carrier); *United States* v. *Van Leeuwen,* supra (United States mail); *United States* v. *Barry,* 853 F.2d 1479 (8th Cir. 1988) (locked suitcase held by airport bailee); or where the owner or possessor had left the container in a place where he had a reasonable expectation of privacy. See *State* v. *Edwards,* supra (backpack located in apartment where defendant was temporarily residing).

Thus, the closed container cases do not compel a conclusion that the defendant in this case had a reasonable expectation of privacy in the contents of his duffel bag or cardboard box. These cases do not, however, preclude such a conclusion, because none involved the unique factual circumstances of this case. They strongly suggest, however, that the weighty interest in the expectation of privacy in the contents of luggage may be recognized by society under the facts of this case.

We turn, therefore, to a different line of authority, namely, those cases, often gathered under the fourth amendment rubric of "abandonment," where luggage and other closed containers have been left by their owners or possessors in open fields or areas accessible to the public. Although we have, in a fourth amendment context, used the term "abandonment" in its common law sense of a voluntary and intentional renunciation

---

[15] In *Arkansas* v. *Sanders,* 442 U.S. 753, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979), Chief Justice Burger, the author of the court's opinion in *United States* v. *Chadwick,* 433 U.S. 1, 97 S. Ct. 2476, 53 L. Ed. 2d 528 (1977), and Justice Stevens stated: "The essence of our holding in *Chadwick* is that there is a legitimate expectation of privacy in the contents of a trunk or suitcase *accompanying or being carried by a person;* that expectation of privacy is not diminished simply because the owner's arrest occurs in a public place." (Emphasis added.) *Arkansas* v. *Sanders,* supra, 766–67 (Burger, C. J., and Stevens, J., concurring).

of ownership; see *State* v. *Zindros,* 189 Conn. 228, 240, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984); it is clear that the proper "test for abandonment in the search and seizure context is distinct from the property law notion of abandonment: it is possible for a person to retain a property interest in an item, but nonetheless to relinquish his or her reasonable expectation of privacy in the object." *United States* v. *Thomas,* supra, 845.

The abandonment inquiry returns us, therefore, to the original threshold inquiry for fourth amendment purposes. "Whether property has been 'abandoned,' in this sense, does not depend on where legal title rests, or whether one asserting a Fourth Amendment right has a legally enforceable possessory interest in the property; the question, rather, is whether the person claiming the protection of the Fourth Amendment 'has a legitimate expectation of privacy in the invaded place.' *Rakas* v. *Illinois,* [supra, 143]." *United States* v. *Oswald,* 783 F.2d 663, 666 (6th Cir. 1986). "In essence, what is abandoned is not necessarily the defendant's property, but his reasonable expectation of privacy therein." *St. Paul* v. *Vaughn,* 306 Minn. 337, 346, 237 N.W.2d 365 (1975); see also *United States* v. *Most,* supra, 198. Furthermore, although the fourth amendment notion of abandonment is not congruent with its common law counterpart, it is relevant although not necessary to the fourth amendment abandonment inquiry whether the defendant manifested by his conduct an intent to shed, albeit temporarily, his expectation of privacy in the item or container involved. See *United States* v. *Thomas,* supra, 845; see also *California* v. *Greenwood,* supra, 39–40 (intent to discard relevant to whether defendant had reasonable expectation of privacy in closed, opaque garbage bags).

Thus, when the trial court applied the abandonment doctrine by deciding that a reasonable person would

have considered the defendant's property to have been abandoned, it employed an incomplete test. Although whether a reasonable person would view property to have been abandoned may be relevant to whether the owner or possessor had abandoned his expectation of privacy therein, that is not the end of the inquiry for fourth amendment purposes. The test is whether, under all the facts, the owner or possessor may fairly be deemed as a matter of law to have relinquished his expectation of privacy in the object in question, and, where the object is a piece of luggage, in the contents thereof.

The abandonment cases tend to point in a direction favorable to the state's position. In *United States* v. *Thomas,* supra, the defendant placed his gym bag in the hallway of an apartment building and began to walk down the stairway. The court held that the warrantless search and seizure of the bag was valid because the defendant had "left it behind in a public place where he retained no reasonable expectation of privacy in it." Id., 846. The court also held that it was irrelevant that he intended to return for the bag. Id. Similarly, in *United States* v. *Brown,* 473 F.2d 952 (5th Cir. 1973), the defendant had buried a suitcase under a chicken coop on an abandoned farm. The court held that the warrantless search and seizure of the suitcase was valid because it came within the open fields doctrine, and because the defendant had voluntarily " 'discarded, *left behind,* or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.' " (Emphasis in original.) Id., 954 n.5, quoting *United States* v. *Colbert,* 474 F.2d 174, 176 (5th Cir. 1973); see also *California* v. *Greenwood,* supra, 39–40 (homeowner has no reasonable expectation of privacy in closed, opaque trash bags left for collection at curb outside curtilage of home); *United States*

v. *Oswald,* supra (defendant retained no reasonable expectation of privacy in luggage left in unlocked, burned-out car at side of highway).

Like the luggage cases, however, these cases do not compel the conclusion that the defendant in this case retained no reasonable expectation of privacy in his duffel bag and cardboard box. Like the luggage cases, these cases are distinguishable because none of them involved the search of luggage of a homeless defendant living in a secluded area that the police knew he regarded as his home, where the search took place shortly after the arrest of the defendant.[16] Furthermore, unlike this case, there is no indication in those cases that the defendant raised or the court considered the defendant's independent privacy interest in the interior of the closed containers. Finally, unlike most of the abandonment cases, there is in this case no element of conduct manifesting a temporary intent to relinquish an expectation of privacy in the contents of the luggage. Indeed, the defendant in this case intended to shield those contents from the gaze of others when he left them in the bridge abutment area during the day, and, of course, no contrary intent can be inferred from the fact that the police arrested him and thus prevented him from returning to his goods and effects that night. Thus, these cases do not require a rejection of the defendant's position.

Neither *Oliver* nor *Greenwood,* moreover, controls this case. In *Oliver,* the court's textual fourth amendment rationale for the open fields doctrine was that "open fields [are not] 'effects' within the meaning of the Fourth Amendment." *Oliver* v. *United States,*

---

[16] By contrast, in *United States* v. *Ruckman,* 806 F.2d 1471, 1473 (10th Cir. 1986), where the search of the defendant's cave did take place while he was under arrest and in custody, there was no indication that the search invaded any luggage or other appropriate closed containers located therein.

supra, 176. By contrast, one's luggage is an "effect" within the meaning of the fourth amendment. See *United States* v. *Jacobsen,* supra, 114; *United States* v. *Chadwick,* supra, 12. In *Oliver,* furthermore, unlike this case, the court was concerned with marihuana growing openly in the field, and not the search of closed containers. Thus, the tension that we earlier articulated between the closed container cases and the open fields or abandoned property cases was not present in *Oliver.*

In *Greenwood,* the court relied not only on the fact that the garbage bags in question were available to members of the public but also on the fact that the defendants "placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through the [defendants'] trash or permitted others, such as the police, to do so." *California* v. *Greenwood,* supra, 40. The court therefore concluded that the defendants "had no reasonable expectation of privacy in the inculpatory items that they discarded." Id., 40–41. No such purpose to leave for collection by a third party or to discard in any sense is present in this case.

We return, therefore, to first principles in order to resolve the question of whether the defendant had a reasonable expectation of privacy in his duffel bag and cardboard box at the time of the search. In considering whether an expectation of privacy in a particular place is one that society is prepared to recognize as reasonable, we ask whether it is one "in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy." *United States* v. *Taborda,* 635 F.2d 131, 138 (2d Cir. 1980). That is necessarily a fact-specific inquiry. In this regard, we again acknowledge that it is pertinent, but not determinative, that the location of the luggage involved was public land, and that the defendant was in effect a trespasser thereon. These

factors, although relevant and helpful, must not be applied mechanically. "They are not ends in themselves; they merely aid in evaluating the ultimate question in all fourth amendment cases—whether the defendant had a legitimate expectation of privacy, in the eyes of our society, in the area searched." *United States* v. *Ruckman,* supra, 1476 (McKay, J., dissenting).

Applying these first principles to the facts of this case, we conclude that the defendant had a reasonable expectation of privacy in his duffel bag and cardboard box. First, the "place" searched in this case was the interior of his closed duffel bag and box. Our society has traditionally afforded a high degree of deference to expectations of privacy in closed containers because such an area is normally intended as a repository of personal effects. Second, these containers were located in a place that, as the police knew when they searched them, the defendant regarded as his home, and that he maintained as such, however roughly. Third, the defendant, because he was under arrest and in police custody, could not be at the place he regarded as his home when the search occurred, and thus was rendered unable to assert his fourth amendment rights in the luggage.[17] Fourth, the purpose of the search was not to safeguard the luggage or identify its owner, but to gather evidence of the very crimes for which the defendant was in custody.

We believe that under these particular circumstances, society's code of values and its notions of custom and

---

[17] The dissent's insistence that we have improperly expressed "a concern about . . . pretextual arrests"; infra, 140; serves only to answer an argument that we do not make. Our reference here is not the result of any such concern; we acknowledge that there is no evidence in this record to suggest a pretextual arrest. By our reference to the defendant's absence at the time of the search due to his arrest, we mean only that society would factor that absence into its calculus of whether the defendant's expectation of privacy was reasonable under all the circumstances of the case.

civility would cause it to recognize as reasonable the defendant's expectation of privacy in his duffel bag and cardboard box. The interior of those two items represented, in effect, the defendant's last shred of privacy from the prying eyes of outsiders, including the police. Our notions of custom and civility, and our code of values, would include some measure of respect for that shred of privacy, and would recognize its assertion as reasonable under the circumstances of this case.

Furthermore, employing a balancing test—in this case, balancing society's interest in law enforcement against the defendant's expectation of privacy in his luggage—we conclude that there would not be a significant impairment of the interest in law enforcement by the recognition of that significant privacy interest. Just as it was deemed necessary and reasonable for the police in *Chadwick* and *Sanders* to secure warrants before searching the luggage involved there, in order to preserve an individual's significant interest in the privacy of the contents of luggage, we perceive no significant impairment of society's interest in law enforcement by requiring the police in this case to have secured a warrant before searching the defendant's luggage, in order to preserve the same privacy interest. To conclude otherwise under the facts of this case would mean that this defendant's reasonable expectation of privacy against police intrusion was limited to the contents of only those closed containers that he had with him, and did not extend to those contents that he could not protect from invasion because he had been taken into custody. Such a result under the facts of this case would come dangerously close to bringing to fruition the famous ironic reference of Anatole France to "the majestic equality of the laws which forbid rich and poor alike to sleep under bridges, to beg in the streets, and to steal bread." A. France, The Red Lily (Stephens trans. 1925) p. 91. We decline so to hold, because we

do not believe that our code of values or our notions of civility are so cramped.

In sum, the defendant retained his reasonable expectation of privacy in the contents of his duffel bag and cardboard box. Absent the applicability of a legitimate exception to the warrant requirement, the warrantless search of those items was invalid, and the evidence yielded by that search should have been suppressed.

## II

The defendant next claims that both his statutory and his constitutional rights to a speedy trial were violated by an eighteen month delay before trial.[18] This claim is without merit.

On August 5, 1987, the defendant was arrested, and remained in custody thereafter. On September 23, 1987, the state filed its first of five informations.[19] On October 5, 1987, the defendant filed his first motion for a speedy trial, which the trial court, *Ronan, J.*, denied on December 29, 1987. On March 30, 1988, the defendant filed his second motion for a speedy trial, which the trial court, *Ronan, J.*, granted, ordering that

[18] Although we conclude that the defendant is entitled to a new trial, we consider this claim because, if meritorious, it would require dismissal of the charges against the defendant and would obviate the need for a new trial.

[19] The first information, filed on September 23, 1987, charged the defendant with first degree manslaughter, occurring "on or about" July 30, 1987. The second information, filed April 29, 1988, charged the defendant with felony murder, first degree burglary, and first degree robbery, occurring "on or about" July 29, 1987, "in the evening hours." The third information, filed June 1, 1988, charged the defendant with felony murder, first degree burglary, and first degree robbery, occurring "on or about" July 29, 1987, "in the evening hours." The fourth information, filed August 23, 1988, charged the defendant with felony murder, first degree burglary, and first degree robbery, occurring "on or about" July 30, 1987, "in the morning hours." The fifth information, filed on March 3, 1989, charged the defendant with felony murder and first degree robbery, occurring "on or about" July 30, 1987, "in the morning hours."

the defendant be tried immediately upon the disposition of the trial of Mark Allen, an essential witness for the state.[20]

On May 17, 1988, the defendant, claiming denial of his speedy trial rights, moved to dismiss the charges against him. On May 18, 1988, Allen was convicted, and the state announced that it was ready to proceed with the trial of the defendant. At that time, however, the defendant was not prepared to begin the trial, and, on May 25, 1988, he moved for a continuance, which was granted indefinitely, leaving a date for trial to be determined later at a pretrial conference. On May 26, 1988, the trial court, *Maiocco, J.,* denied the defendant's motion to dismiss. On June 11, 1988, the court assigned the case for trial on September 6, 1988.

The trial did not proceed on September 6, 1988, as scheduled, and, on September 14, 1988, the defendant's attorney withdrew as counsel due to a conflict of interest. On October 7, 1988, the defendant moved for appointment of a special public defender, which the court granted on October 20, 1988. The trial of the defendant began on February 6, 1989, before Judge Purtill.

A

The defendant first asserts that his statutory right to a speedy trial, pursuant to General Statutes § 54-82m,[21] was violated. The defendant notes that he

---

[20] The defendant acknowledges that Allen, who was tried separately from the defendant as an accomplice, was an essential state's witness because his testimony was required to connect the defendant to the robbery and murder of the victim.

[21] General Statutes § 54-82m provides: "RULES RE SPEEDY TRIAL TO BE ADOPTED BY JUDGES OF SUPERIOR COURT EFFECTIVE JULY 1, 1985. In accordance with the provisions of section 51-14, the judges of the superior court shall make such rules as they deem necessary to provide a procedure to assure a speedy trial for any person charged with a criminal offense on or after July 1, 1985. Such rules shall provide that (1) in any case in which

was arrested on August 5, 1987, that he remained in custody thereafter, and that he made two motions for a speedy trial, but that his trial did not begin until February 6, 1989, eighteen months later, in violation of the statute which prohibits the delay of trial longer than eight months for persons incarcerated in state correctional institutions. Because the defendant's argument fails to consider periods of time properly excluded from the calculation, we disagree.

General Statutes § 54-82m provides in pertinent part: "(1) . . . when such defendant is incarcerated in a correctional institution of this state pending such trial . . . the trial of such defendant shall commence *within eight months* from the filing date of the information or indictment or from the date of arrest, whichever is later; and (2) if a defendant is not brought to trial within the time limit set forth in subdivision (1) and a trial is not commenced within thirty days of a motion for a speedy trial made by the defendant at any time after such time limit has passed, the information or indictment shall be dismissed." (Emphasis added.) In calculating the eight month period within which an incarcerated defendant must be tried, however, Practice Book § 956C (b) provides for the exclusion of "[a]ny

a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of a criminal offense shall commence within twelve months from the filing date of the information or indictment or from the date of the arrest, whichever is later, except that when such defendant is incarcerated in a correctional institution of this state pending such trial and is not subject to the provisions of section 54-82c, the trial of such defendant shall commence within eight months from the filing date of the information or indictment or from the date of arrest, whichever is later; and (2) if a defendant is not brought to trial within the time limit set forth in subdivision (1) and a trial is not commenced within thirty days of a motion for a speedy trial made by the defendant at any time after such time limit has passed, the information or indictment shall be dismissed. Such rules shall include provisions to identify periods of delay caused by the action of the defendant, or the defendant's inability to stand trial, to be excluded in computing the time limits set forth in subdivision (1)."

period of delay resulting from the absence or unavailability of the defendant, his counsel, or any essential witness for the prosecution or defense. For purposes of this paragraph, a defendant or any essential witness shall be considered unavailable whenever his whereabouts are known but his presence for trial cannot be obtained by due diligence or he resists appearing at or being returned for trial." Furthermore, Practice Book § 956C (g) provides that "[t]he period of delay resulting from a continuance granted by the judicial authority at the personal request of the defendant" is excluded in calculating the eight month period. In sum, the state was required to try the defendant within eight months of the filing of the first information, excluding the time periods set forth by statute.

The defendant's statutory claim is flawed first by his error in setting the date on which to begin the calculation of the statutory period. The eight month period does not begin to run until the "filing date of the information or indictment or from the date of arrest, whichever is later." General Statutes § 54-82m. Because the defendant was arrested on August 5, 1987, which preceded the filing of the first information on September 23, 1987, the latter date is used to calculate the time frame within which trial was required to begin. General Statutes § 54-82m.

The defendant also fails to subtract from his delay calculation two periods of time that are excluded from the computation by the Practice Book rules that supplement the statute. First, any period of delay resulting from the absence of an essential witness is not included in determining whether the eight month time period has run. Practice Book § 956C (b). The trial court, in granting the defendant's second motion for a speedy trial, ordered that the defendant's trial commence upon the conclusion of Allen's trial. The defendant, while admitting that Allen was an essential

witness, nevertheless fails to deduct from his calculation the eight month period from September 23, 1987, through May 18, 1988, when Allen was not available.

Second, the defendant asserts that the state should be held accountable for the remaining nine month delay between the conclusion of Allen's trial and the start of his trial because the state filed five different informations against the defendant.[22] This claim, however, ignores Practice Book § 956C (g), which excludes from the calculation of the eight month period "[t]he period of delay resulting from a continuance granted by the judicial authority at the personal request of the defendant."[23] It was the defendant who was not prepared to proceed after Allen's trial was completed, who requested a continuance, and who required new counsel, delaying the date upon which trial could begin. The state is not accountable for those periods of time when it was prepared to proceed to trial but was hindered by the defendant.

### B

The defendant also claims that his constitutional right to a speedy trial was violated. See U.S. Const., amend. VI; Conn. Const., art. I, § 8. This claim likewise fails.

The sixth amendment guarantee of a speedy trial is a fundamental right applicable to the states through the fourteenth amendment to the United States constitution. *Klopfer* v. *North Carolina*, 386 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). This right is also guaranteed by the constitution of Connecticut, article first, § 8. "Although the right to a speedy trial is fundamental, it is necessarily relative, since a requirement of unreasonable speed would have an adverse impact both on the accused and on society. *United States* v.

---

[22] See footnote 19, supra.
[23] See also Part IIB, infra, and discussion therein.

*Ewell,* 383 U.S. 116, 120, 86 S. Ct. 773, 15 L. Ed. 2d 627 (1966); *State* v. *Troynack,* 174 Conn. 89, 91, 384 A.2d 326 (1977)." *State* v. *Johnson,* 190 Conn. 541, 544, 461 A.2d 981 (1983).

"The Supreme Court of the United States and this court have identified four factors which form the matrix of the defendant's constitutional right to a speedy adjudication: [l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Barker* v. *Wingo,* 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); *State* v. *Lloyd,* 185 Conn. 199, 208, 440 A.2d 867 (1981); *State* v. *Nims,* 180 Conn. 589, 591, 430 A.2d 1306 (1980)." *State* v. *Johnson,* supra, 544–45. "[N]one of the factors standing alone would demand a set disposition; rather it is the total mix which determines whether the defendant's right was violated." *State* v. *Nims,* supra, 592. In light of our consideration of the four *Barker* factors, we conclude that the defendant was not denied his right to a speedy trial.

There was an eighteen month time interval between the defendant's arrest and his trial. While the defendant blames the state for the whole of this delay, it was in fact caused by the initial trial of the defendant's accomplice, a continuance requested by the defendant, and the withdrawal of the defendant's counsel and appointment of new counsel. The state was prepared to proceed to trial immediately after Allen's trial was completed, within ten months from the arrest of the defendant. The defendant asserts, however, that the delay resulting from the requested continuance and the appointment of new counsel should be attributed to the state because the state, by filing five different informations[24] against him, impeded the work of his attorney. The record does not support this assertion.

[24] See footnote 19, supra.

The defendant was aware that Allen was being tried as an accomplice to the murder of the victim, and that Allen was to be the state's primary witness against him in his trial. While the first information against the defendant charged him with first degree manslaughter, the second[25] and subsequent informations filed against the defendant were all based upon charges of felony murder, first degree burglary,[26] and first degree robbery, the identical charges of which Allen, the defendant's accomplice, was tried and convicted on May 18, 1988. See *State* v. *Allen,* 216 Conn. 367, 579 A.2d 1066 (1990). In light of the defense counsel's awareness of Allen's trial as the defendant's accomplice, and her reported attendance at that trial and possession of the transcripts of that trial, we conclude that the changes made in the substitute informations filed seven months after the original information neither surprised defense counsel nor rendered her previous work ineffective.

The defendant's additional claim, namely, that the changes in the time of the crimes alleged rendered his attempts at providing alibi testimony futile, is insupportable. The time periods of the crime cited in the five informations range from "on or about" July 29, 1987, in the evening hours through "on or about" July 30, 1987. This discrepancy in the informations "does not present such a strong case for the defendant that he is excused from the requirement of showing prejudice." *State* v. *L'Heureux,* 166 Conn. 312, 320, 348 A.2d 578 (1974).

The discrepancies among the dates and times of the crimes alleged in the different informations were not substantial enough to prejudice the defendant's abil-

---

[25] The second information was filed against the defendant on April 29, 1988.

[26] The charge of first degree burglary was not included in the final information filed against the defendant on March 3, 1989.

ity to procure alibi testimony. The defendant does not claim that he would have produced additional or different witnesses depending on whether the date was July 29, 1987, as opposed to July 30, 1987. Because the filing of the substitute informations did not hamper the defendant's ability adequately to prepare his defense; id.; we conclude that the delays in the trial caused by the defendant's request for a continuance and for an appointment of new counsel cannot be attributed to the state. See *State* v. *Antrum,* 185 Conn. 118, 122–23, 440 A.2d 839 (1981) (where state was prepared for trial and defendant requested continuances and requested new counsel, court tolled periods of time delay attributable to defendant); see also *United States* v. *Loud Hawk,* 474 U.S. 302, 306, 106 S. Ct. 648, 88 L. Ed. 2d 640, reh. denied, 475 U.S. 1061, 106 S. Ct. 1289, 89 L. Ed. 2d 596 (1986) (time consumed by defendant pursuing interlocutory appeal not weighed in support of his speedy trial claim).

The second factor under the *Barker* matrix concerns the reasons for the delay of trial. As previously discussed, the first nine months of the eighteen month postponement was the result of the state's need to try an accomplice to the crime in order to secure the testimony of a necessary witness. While this delay cannot be attributed to the defendant, it will not be weighed heavily against the state.

The third *Barker* factor is the assertion of the right to a speedy trial. On October 5, 1987, the defendant first moved for a speedy trial. The court denied this motion on December 29, 1987. He again moved for a speedy trial on March 30, 1988. The court granted this motion on April 6, 1988, and ordered the trial to commence upon the conclusion of Allen's trial. While it is apparent that the defendant initially strongly asserted his right, "[t]he record indicates, however, that the defendant himself contributed substantially to the

delay." *State* v. *Toste,* 198 Conn. 573, 591–92, 504 A.2d 1036 (1986). Because the state was prepared to try the defendant at the end of Allen's trial on May 18, 1988, and because the defendant was responsible for the remaining nine months of delay, his early assertion of his right to a speedy trial is afforded little weight in the *Barker* balancing test.

The final factor is the prejudice to the defendant; *Barker* v. *Wingo,* supra, 532; which is "the linchpin of the speedy trial claim." *State* v. *Lloyd,* 185 Conn. 199, 209, 440 A.2d 867 (1981). "While it is possible that the other factors together might make a showing of prejudice unnecessary in any given case; *Moore* v. *Arizona,* 414 U.S. 25, 26, 94 S. Ct. 188, 38 L. Ed. 2d 183 (1973); we do not find that situation here. Nor where such a showing is needed will it be presumed." *State* v. *Morrill,* 197 Conn. 507, 526, 498 A.2d 76 (1985). "Three interests have been identified as those which the right to a speedy trial was designed to protect and which therefore may be prejudiced by the deprivation of that right." Id. Those interests are: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker* v. *Wingo,* supra, 532. The defendant argues that he suffered actual prejudice resulting from the impairment in the memories of several witnesses due to the delay between the alleged crime and the trial. A claim of general weakening of witnesses' memories, relying on the simple passage of time, "cannot, without a more specific showing, be said to prejudice the defendant." *State* v. *Morrill,* supra, 527–28. The defendant does, however, cite specific instances of witnesses' forgetfulness. We therefore

examine these instances to determine whether the defendant has made a sufficient showing of prejudice.

The defendant initially claims that on cross-examination a state's witness, Charles C., could not remember numerous facts relating to a larceny allegedly committed against him by the defendant six days after the murder of the victim in this case. Specifically, the defendant claims that, due to the delay before trial, Charles C. could not recall: (1) the quantity or nature of the alcohol that he was consuming on the day of the alleged larceny; (2) the value of the coins allegedly stolen from him by the defendant; (3) what he told the police immediately after he discovered the items were missing; and (4) whether the defendant was carrying a shopping bag or any other type of container when Charles C. picked up the defendant at the park or when the defendant left his apartment.

The defendant's assertion that Charles C.'s failing memory prejudiced him is misplaced. The United States Supreme Court, in *Barker* v. *Wingo,* supra, 532, stated that "[t]here is also prejudice if *defense witnesses* are unable to recall accurately events of the distant past." (Emphasis added.) Charles C., however, appeared as a witness for the state, and, as we noted in *State* v. *Morrill,* supra, 528, " '[i]f the witnesses [with a failing memory] support the prosecution, [*the prosecution's*] *case* will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof.' " (Emphasis added.)

"[W]hile memory lapses by *prosecution* witnesses may under some circumstances prejudice the defense, such as where memory loss is egregious and the defendant is 'convicted on failing memories' "; (emphasis in original) *Isaac* v. *Perrin,* 659 F.2d 279, 284 (1st Cir. 1981); the memory losses here are relatively minor. The relevance of the witness' testimony regarding (1) the

quantity and nature of the alcohol consumed on the day of the alleged larceny, (2) the value of the coins taken from him, (3) the information that he gave the police after discovering the missing items, and (4) whether the defendant had been carrying a shopping bag on the day of the incident, is weakened by the fact that "[t]he defendant points to nothing in the transcripts which indicates that the testimony of [Charles C.] would have been more favorable to him if [his memory] had been fresher." *State* v. *Gasparro,* 194 Conn. 96, 102, 480 A.2d 509 (1984), cert. denied, 474 U.S. 828, 106 S. Ct. 90, 88 L. Ed. 2d 74 (1985). Indeed, it is clear from this record that any memory loss by Charles C. resulting from the lapse of time inured to the defendant's favor, not to his prejudice, since the defendant was able to impeach Charles C.'s testimony by eliciting that loss on cross-examination.

The defendant next contends that he was prejudiced by the failing memories of two defense witnesses, Gerald Lasalle and Linda Spencer, regarding an alleged mugging of the defendant that served to explain the presence of blood on the defendant's pants found in his belongings. The defendant claims that, as a result of the delay in trial, Lasalle was unable to recall the date when the defendant was mugged and its proximity to the murder, details of the mugging as reported by the defendant, or the amount of blood on the defendant's pants due to the mugging, and that Linda Spencer was not able to recall the date of the mugging.

The transcript reveals that Lasalle was able to state that the mugging occurred sometime in June, that it could have been late June, but that it was not in early July. Spencer testified that the mugging occurred sometime in June, or in late June, early July.[27]

---

[27] Since the date of the crimes, July 29 or July 30, 1987, was not disputed, the witnesses' recollections of the mugging in June established its proximity to the murder, contrary to the defendant's assertion.

Although Lasalle and Spencer were unable to pinpoint the exact date of the mugging, the defendant has not demonstrated that the precise date was a material issue in his defense. "Although faded memory may result in prejudice . . . in order to prejudice the defense to the extent necessary to constitute a speedy trial violation, the faded memory must substantially relate to a material fact in issue." *United States* v. *Edwards,* 577 F.2d 883, 889 (5th Cir. 1978). Clearly, the testimony of both Lasalle and Spencer tended to establish that the defendant had been mugged previous to the crimes in question and that the mugging had resulted in the defendant's white pants becoming bloodied. The defendant appears to contend that the unidentifiable blood[28] found on his pants, therefore, was his from the mugging and not that of the victim. Since the relevant issue behind this testimony was whether the blood belonged to the victim, the inability of the witnesses to recall the exact date of the mugging was not prejudicial.[29]

The defendant next claims that the delay in trial caused Lasalle to forget the "details" of the mugging as reported to him by the defendant. Lasalle testified that the defendant told him that he had been mugged by two men and beaten with a stick in the Long Wharf section of New Haven. The only details that Lasalle

---

[28] The criminalist at the state forensic laboratory, Beryl Novitch, while able to determine that the stains on the pants were caused by human blood, was unable to determine whether the blood was that of the victim.

[29] We also note that the defendant's trial counsel was aware of the identity of the defense witnesses, was in contact with Lasalle in Florida one year prior to the trial, and could have obtained statements earlier "so that at trial their memories could have been refreshed if they failed to recall pertinent details." *Townsend* v. *United States,* 512 A.2d 994, 998 (D.C. App. 1986), cert. denied, 481 U.S. 1052, 107 S. Ct. 2188, 95 L. Ed. 2d 843 (1987). This observation is especially relevant in this case where the defendant was responsible for nine months of the delay in trial and is claiming prejudice due to a witness' loss of memory caused by the passage of time.

could not remember, as demonstrated by the transcript, were whether the defendant had described to Lasalle the race of the assailants and, if he had, what that race was. Again, the defendant has made no showing as to the materiality of this evidence to the outcome of the trial, and, therefore, has not established substantial prejudice. *United States* v. *Edwards,* supra, 889.

The defendant also argues that he was prejudiced by Lasalle's inability to recall the amount of blood found on the defendant's white pants as a result of the mugging. Although Lasalle testified that he knew of the pants in question, that he had seen the blood on them that came from a mugging, that he had observed the defendant wearing the pants on a number of occasions after the mugging incident, and that on those occasions the pants appeared to be clean and without spots, the witness was never asked to quantify the amount of blood he observed on the pants. The defendant has not, therefore, made a showing of substantial prejudice.

## III

The defendant next claims that the trial court improperly admitted certain "other misconduct" evidence, namely, evidence of a larceny by the defendant from Charles C.[30] We disagree.

The relevant facts are as follows. At trial, the state called Charles C., a male homosexual, who testified that six days after the crimes charged herein he was the victim of a larceny by the defendant. Charles C. testified that, looking for sex, he "picked up" the defendant in a park. The two men returned to Charles C.'s apartment, where the defendant took a shower and then flirted with Charles C. Prior to engaging in sexual relations, Charles C. went to the liquor store to pur-

---

[30] We consider this claim of the defendant, as well as his final claim; see Part IV, infra; because they are likely to arise upon the new trial.

chase alcohol for the two men. On returning to his apartment, he found the defendant dressed and agitated, anxious to leave the apartment and to be taken to New Haven. After driving the defendant to his desired destination, Charles C. returned to his apartment and discovered that $600 to $800 in change, a bayonet, jewelry, and a Nazi-type dagger were missing.

The trial court admitted this testimony as evidence corroborative of the state's main witness, Mark Allen, whose testimony had been severely impeached by defense counsel on cross-examination, and as evidence of a system of criminal activity and of the defendant's intent in stealing from homosexuals. The defendant objected to the admission of the evidence and excepted to the trial court's ruling. In its instructions to the jury, the court gave an appropriate limiting instruction regarding this evidence.[31]

"The rules governing the admissibility of evidence of a criminal defendant's prior [or subsequent] misconduct are well established." *State* v. *Sierra,* 213 Conn. 422, 428, 568 A.2d 457 (1990). Although as a general rule such evidence is inadmissible as proof of the defendant's guilt of the crime charged based on his propensity to commit crimes, it is admissible for many other purposes, such as proof of intent, identity, malice, motive, a system of criminal activity, or an element of the crime. Id., 428–29. Such evidence may also be used "to corroborate crucial prosecution testimony." *United States* v. *Everett,* 825 F.2d 658, 660 (2d Cir. 1987).

---

[31] The relevant portions of the jury instructions provide: "You may not consider this testimony as evidence that the defendant was an evil person and was therefore more likely to engage in criminal conduct. But you may consider such testimony and may consider similarities between events as evidence tending to show a common design or plan to steal from homosexual men."

To be admitted under one of these exceptions, the evidence must be relevant and material to the exception claimed, and the probative value of the evidence must outweigh its prejudicial effect. *State* v. *Sierra,* supra. "We recognize that this balancing process is an inherently difficult one, and will reverse the trial court's decision only when it is manifest that an abuse of discretion or an injustice has occurred." *State* v. *Marra,* 215 Conn. 716, 738, 579 A.2d 9 (1990).

With these general principles in mind, we first consider the defendant's claim that the trial court improperly admitted the evidence concerning the subsequent larceny as corroborative of the state's main witness, Allen. We conclude that the evidence was admissible.

The defendant severely impeached Allen, the only witness who placed the defendant at the scene of the crime. On cross-examination, the defendant brought out that Allen had lied in his statements to the police and at his own trial. The defendant also demonstrated many instances of inconsistent testimony at the probable cause hearing and during the course of his testimony at the trial. By this impeachment, the defendant was able to imply that Allen was implicating the defendant in order to shift the blame onto him, and in hopes of obtaining a more lenient sentence for his own conviction.

Although this court has never directly addressed the issue of the admissibility of evidence of other misconduct of a criminal defendant to corroborate the testimony of a crucial prosecution witness, we touched upon that question in *State* v. *Smith,* 198 Conn. 147, 157, 502 A.2d 874 (1985). In *Smith,* we held that the trial court properly admitted the evidence of a subsequent arrest of the defendant for a breach of the peace that occurred within hours after the rape for which the defendant was on trial, because the defendant was

arrested while in the possession of a knife and a gun that the victim of the first crime had identified. Id. We held that the evidence derived from the arrest for the subsequent breach of the peace "was certainly corroborative of the victim's testimony at trial" and "was also relevant to establish the identity of the defendant." Id. While *Smith* demonstrates the acceptance of corroboration as a theory to admit evidence of other misconduct, we have yet to establish the scope and permissible use of such corroborative evidence as an independent exception.

We find guidance in the approach taken by the Second Circuit Court of Appeals on this issue. In *United States* v. *Everett,* supra, 660, the court determined that pursuant to Federal Rule of Evidence 404 (b),[32] which is similar to Connecticut case law on the admission of other misconduct evidence,[33] "evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony. See, e.g., *United States* v. *Mohel,* 604 F.2d 748, 754 (2d Cir. 1979); *United States* v. *O'Connor,* 580 F.2d 38, 43 (2d Cir. 1978); *United States* v. *Williams,* 577 F.2d 188, 192 (2d Cir.), cert. denied, 439 U.S. 868, 99 S. Ct. 196, 58 L. Ed. 2d 179 (1978)." The court noted, however, that "the prosecution is not permitted to wholesale proof

[32] Federal Rule of Evidence 404 (b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[33] Connecticut case law parallels the exceptions found in Federal Rule of Evidence 404 (b). For example, similar to the federal rule, evidence of other misconduct is admissible in Connecticut to show intent, identity, motive; *State* v. *Sierra,* 213 Conn. 422, 429, 568 A.2d 557 (1990); opportunity; *State* v. *Silva,* 201 Conn. 244, 248–49, 513 A.2d 1202 (1986); absence of mistake or accident; *State* v. *Tucker,* 181 Conn. 406, 414–17, 435 A.2d 986 (1980); knowledge; *State* v. *Fredericks,* 149 Conn. 121, 124, 176 A.2d 581 (1961); and common scheme or plan. *State* v. *Morowitz,* 200 Conn. 440, 442–43, 512 A.2d 175 (1986).

into evidence under the guise of 'corroboration purposes.' " *United States* v. *Everett,* supra. "To avoid potential prosecutorial abuse, we have required the proponent of the evidence to demonstrate a close relationship between the proffered evidence and the evidence to be corroborated. Other crimes evidence, therefore, is only admissible for corroborative purposes, if the corroboration is 'direct and the matter corroborated is significant.' " Id., quoting *United States* v. *Mohel,* supra, 754.

Under this test, significant evidence is defined as important, as opposed to trivial, evidence. *United States* v. *Everett,* supra. Direct corroborating evidence is that which "is not wholly disconnected, remote, or collateral to the matter corroborated." Id. The requirement that the corroborating evidence be direct is necessary in order to ensure that the link between the corroborative evidence and the facts to be inferred therefrom is not too attenuated or nonprobative; otherwise, the evidence might unfairly reflect upon the defendant's propensity to commit crimes. Id., 661.

Charles C.'s testimony qualified as significant because Allen was the only witness placing the defendant at the scene of the crime. Because Allen's testimony was weakened as a result of cross-examination, which brought out his prior inconsistent and untruthful statements, the state offered Charles C.'s testimony to the subsequent larceny in order to strengthen Allen's testimony regarding the manner and reason the defendant perpetrated the crimes. This evidence provided important details of a course of conduct of the defendant, and reinforced the testimony of a critical state's witness. Id.

Charles C.'s testimony likewise satisfied the requirement that the corroborating evidence be direct. Charles C.'s testimony was not "wholly disconnected, remote,

or collateral to the matter corroborated"; id., 660; because the testimony regarding the defendant's meretricious relationships with homosexuals reinforced Allen's testimony that the defendant brought him to the victim's residence with the intent to steal from the victim, thereby linking the defendant to the ultimate facts to be proven, namely, his presence and participation in the crimes.

Moreover, the record reflects that the trial court carefully balanced the probative value of the evidence against the prejudicial effect and determined that the prejudice to the defendant did not outweigh its probative value. The evidence of the subsequent larceny was probative because it tended to dispel an innocent explanation for the defendant's relationship with the victim and to show that the defendant had a system of "hustling" homosexual males in order to engage in larcenous conduct. The evidence also tended to establish that, on at least one occasion very close in time to the crimes in issue, the defendant had been picked up by another homosexual man, returned to his apartment, showered and engaged in flirtatious conduct, and eventually stole items belonging to him. Larceny was an element of the crimes in issue in this case. This evidence thereby tended to show a system of criminal activity and allowed the inference that the defendant intended, at the least, to steal from the victim on the occasion in question.

We cannot say, moreover, that the prejudicial effect of the evidence was overwhelming. There was other evidence before the jury that the defendant had engaged in sex with homosexuals for money.[34] It is not likely, therefore, that the evidence in question shocked

---

[34] Allen testified on cross-examination that the defendant "was messing with fagots [sic] at night to get money. That's how he supported himself. He would pick up fagots [sic] at night and that's how he supported himself. He'd go out and the fagots [sic] would pay him."

or inflamed the jury. Additionally, the seriousness of the subsequent crime, a larceny, pales in comparison to the robbery and felony murder charges for which the defendant was standing trial.

Because we recognize the difficulty in this balancing process, we will reverse the trial court's ruling only where there is abuse of discretion or where an injustice has occurred; *State* v. *Marra,* supra, 738; and we will indulge in every reasonable presumption in favor of the trial court's ruling. *State* v. *Sierra,* supra, 435. There was no such abuse of discretion or injustice in this case, especially in light of the limiting instruction given to the jury on this issue. See footnote 31, supra.

This conclusion also disposes in large part of the defendant's claim that the trial court improperly admitted the evidence under the exceptions for evidence of a system of criminal activity and for evidence showing intent. The evidence tended to establish the defendant's intent and also tended to establish his system of stealing from homosexual men whom he visited for the purpose of engaging in sex for pay. Furthermore, the trial court did not abuse its discretion in exercising its balancing function and it gave an appropriate limiting instruction.

The defendant argues, however, that the evidence was improperly admitted because the state failed to demonstrate sufficient similarities between the alleged larceny of Charles C. and the crimes in question. The defendant claims that " ' "[t]he [other crimes or misconduct] must be *so unusual and distinctive as to be like a signature."* McCormick, Evidence § 157.' " (Emphasis added.) *State* v. *Braman,* 191 Conn. 670, 677, 469 A.2d 760 (1983), quoting *State* v. *Ibraimov,* 187 Conn. 348, 354, 446 A.2d 382 (1982). The defendant's argument, however, is based upon a misinterpretation of the case law. As we stated in *State* v. *Shindell,*

195 Conn. 128, 135, 486 A.2d 637 (1985), where *identity* is in issue, the device used must be distinctive, similar to a signature. But where the evidence is admitted under a different theory, such as to establish a continuing system of criminal activity or to show intent, the same degree of similarity is not required.[35] Id.

## IV

The defendant's final claim is that the trial court, by denying him access to certain mental health records of Charles C., denied him his constitutional rights to due process and to confront the witnesses against him.[36] This claim is without merit.

The defendant subpoenaed certain records regarding treatment of Charles C. at the Connecticut Mental Health Center (the center), and requested access to them for purposes of cross-examination. Charles C. gave the trial court permission to examine the records in camera. The trial court did so and denied the defendant's request for access to them.

The defendant's subsequent cross-examination of Charles C. elicited the following facts, inter alia. Charles C., who was forty-seven years old, had been an alcoholic since age eighteen, and had been treated for his alcoholism. He had been under psychiatric care at various times, including a hospitalization in the 1970s. The cross-examination also disclosed that in 1987 Charles C. had been treated at the center for alcoholism and depression. Furthermore, his alcoholism was

[35] We note that the trial court specifically ruled that identity was not in issue in this case. Therefore, the court's concern that evidence of other misconduct to show common scheme or a continuing system of criminal activity might be prejudicial as also reflecting upon identity; see State v. Murrell, 7 Conn. App. 75, 88, 507 A.2d 1033 (1986); is not implicated in this case.

[36] Because the defendant offers no separate analysis of this claim under the constitution of Connecticut, we consider it only under the constitution of the United States.

active in 1987, and on the day of his encounter with the defendant he had drunk a half pint of liquor before meeting the defendant and a pint after the encounter ended. Charles C. also testified that he blacked out after drinking the pint of liquor. In addition, the defendant cross-examined Charles C. about certain inconsistencies between his testimony and his statements to the police.

The defendant does not dispute that the records in question are privileged pursuant to General Statutes §§ 52-146d and 52-146e.[37] In reconciling such a privilege with the defendant's right to confront a state's witness by gaining access to the witness' mental health records, the linchpin is whether the records contain material " ' "especially probative of the ability to 'comprehend, know and correctly relate the truth' "; *United States* v. *Lindstrom,* 698 F.2d 1154, 1165–66 (11th Cir. 1983); so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation. . . .' " *State* v. *Kelly,* 208 Conn. 365, 379–80, 545 A.2d 1048 (1988), quoting *State* v. *Storlazzi,* 191 Conn. 453, 459, 464 A.2d 829 (1983). The determination of access is left to the discretion of the trial court in weighing the probative value of the evidence against the interest in confidentiality of the records. *State* v. *Kelly,* supra, 380. That determination is to be made on a case-by-case basis. Id.

Our own careful examination of the records in question leads us to conclude that they do not contain material especially probative of Charles C.'s ability to comprehend, know and correctly relate the truth so as

---

[37] General Statutes § 52-146d (2) defines " 'Communications and records' " to include "communications and records which occur in or are prepared at a mental health facility . . . ." General Statutes § 52-146e (a) provides in pertinent part that, with certain exceptions not applicable here, "[a]ll communications and records as defined in section 52-146d shall be confidential . . . ."

to justify breach of their confidentiality by disclosing them to the defendant. Moreover, there is nothing in them that would have added significantly to the extensive cross-examination of Charles C. by the defendant. The trial court did not abuse its discretion in denying the defendant's request for access to the records.

The judgment is reversed, and the case is remanded for a new trial.

In this opinion PETERS, C. J., SHEA and GLASS, Js., concurred.

CALLAHAN, J., with whom COVELLO and SANTANIELLO, Js., join, dissenting. I agree with Parts II, III and IV of the majority opinion. I respectfully dissent from Part I, however, because I do not believe that the defendant had a reasonable expectation of privacy in either the area under the bridge abutment or in the contents of the duffel bag and cardboard box found by the police when they searched that area.

I

As a threshold matter, I find no support for the defendant's claim that he had a reasonable expectation of privacy in the abutment area. As the majority opinion clearly demonstrates, a common thread that unifies the intricate and often confusing legal patchwork of fourth amendment case law is that "[w]hat a person knowingly exposes to the public, even in his own home, is not a subject of Fourth Amendment protection." *Katz* v. *United States,* 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *California* v. *Greenwood,* 486 U.S. 35, 40–41, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988) (no reasonable expectation of privacy in opaque garbage bags left for pickup at the curb where the bags were readily accessible to members of the public); *California* v. *Ciraolo,* 476 U.S. 207, 213–14, 106 S. Ct. 1809, 90 L. Ed. 2d 210, reh. denied, 478 U.S.

1014, 106 S. Ct. 3320, 92 L. Ed. 2d 728 (1986) (no reasonable expectation that fenced backyard protected from aerial surveillance by police because "[a]ny member of the public flying in this airspace who glanced down could have seen everything that these officers observed"); *Oliver* v. *United States,* 466 U.S. 170, 179, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984) (no reasonable expectation of privacy in "open fields" because they are accessible to the public and police in a manner that homes, offices and commercial structures are not); *United States* v. *Knotts,* 460 U.S. 276, 281–82, 103 S. Ct. 1081, 75 L. Ed. 2d 55 (1983) (warrantless use of monitoring "beeper" to trace movement of container of chemicals did not violate any legitimate expectation of privacy because movement over public roads can be viewed by anyone).

It is clear that the area under the bridge abutment was one "readily accessible to animals, children, scavengers, snoops, and other members of the public." *California* v. *Greenwood,* supra, 40. In fact, every person present in the state of Connecticut had, with or without a legitimate reason, as much right to be there as did the defendant. In addition to the highway worker who actually came upon the defendant, other persons who might have explored this area include bridge inspectors, police officers, other homeless persons and people seeking out the homeless.[1] The defendant's status as a trespasser on state property is also a significant factor leading to the conclusion that he could not have had a reasonable expectation of privacy in this

---

[1] The homeless may be sought out by persons wishing to provide them with aid or shelter. In addition, the Hartford Courant recently featured a story on an anthropology student who investigates the makeshift living arrangements and belongings of the homeless in Hartford. During his investigations, which are conducted while the homeless person or persons are absent, he often searches areas under highways and rummages through any belongings he finds. See "Anthropologist-in-training tracks the city's homeless," The Hartford Courant, November 12, 1990, pp. A1, A6.

area. See *United States* v. *Ruckman,* 806 F.2d 1471 (10th Cir. 1986) (defendant had no reasonable expectation of privacy in a natural cave on federal land despite his having lived in the cave for eight months); *Amezquita* v. *Hernandez-Colon,* 518 F.2d 8 (1st Cir. 1975), cert. denied, 424 U.S. 916, 96 S. Ct. 1117, 47 L. Ed. 2d 321 (1976) (squatters on public land had no reasonable expectation of privacy in area they occupied). I would conclude that the defendant had no reasonable expectation of privacy in the area under the bridge abutment.

## II

With respect to the defendant's asserted privacy interest in the duffel bag and the cardboard box, I find the majority's decision well intentioned but irreconcilable with existing fourth amendment doctrine. As the abandonment cases cited by the majority indicate, the threshold issue of whether the defendant had a reasonable expectation of privacy in the area under the abutment is closely linked to the question of whether he had a reasonable expectation of privacy in the contents of the duffel bag and box when he left those containers there. Unlike the majority, I cannot divorce the analysis of the container issue from my conclusion on that threshold issue.

As noted above, the common theme underlying the abandonment cases cited by the majority is that it is unlikely that a person can have a reasonable expectation of privacy in a closed container left unattended in a place that is readily accessible to members of the public. See *California* v. *Greenwood,* supra (garbage bags left at curb);[2] *United States* v. *Thomas,* 864 F.2d 843

---

[2] Although the court did not rely on abandonment principles in *California* v. *Greenwood,* 486 U.S. 35, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988), the majority has included this case within its analysis of the cases involving abandonment scenarios, and therefore it is discussed here within this context as well.

(D.C. Cir. 1989) (gym bag left in public hallway of apartment building); *United States* v. *Oswald,* 783 F.2d 663 (6th Cir. 1986) (suitcase left in burned-out automobile on side of highway); *United States* v. *Brown,* 473 F.2d 952 (5th Cir. 1973) (suitcase buried under chicken coop on abandoned farm); *St. Paul* v. *Vaughn,* 306 Minn. 337, 237 N.W.2d 365 (1975) (eyeglass case hidden under a counter in a dry cleaning establishment). My conclusion that the defendant had no legitimate expectation of privacy in the area under the abutment leads me to conclude that he also could not have reasonably expected that the contents of his containers would remain inviolate if left there unattended.[3] I therefore agree with the trial court that the defendant had abandoned these containers for the purposes of fourth amendment analysis.

To avoid this result, the majority relies on three factors to distinguish the present case from the abandonment cases: (1) none of the abandonment cases involve the search of a container left by a homeless person in a place that the police knew he regarded as his home; (2) none of those courts considered the defendant's independent privacy interest in the interior of the closed containers; and (3) in *most* of the abandonment cases the owner of the container manifested an intent to relin-

---

[3] It is not necessary to conclude that a container left unattended in an area to which the public has access would always and invariably be beyond the protection provided by the fourth amendment. In certain cases the circumstances may make it so unlikely that containers will be disturbed even though left in an area accessible to the public that an objectively reasonable expectation of privacy might arise. See *Kelly* v. *State,* 536 So. 2d 1113 (Fla. App. 1988) (defendant had a reasonable expectation of privacy in backpack attached to bicycle and left unattended for ten minutes in a parking lot near a group of persons, one of whom knew the defendant). Implicit in the trial court's ruling on the issue of abandonment here, however, is the conclusion that this is not such a case, and we must accord deference to the factual aspects of that determination. *United States* v. *Thomas,* 864 F.2d 843, 846 (D.C. Cir. 1989); *United States* v. *Oswald,* 783 F.2d 663, 665–66 (6th Cir. 1986).

quish temporarily an expectation of privacy in the contents of the container. I do not find these factors persuasive.

The fact that the police knew that the defendant was homeless and that he considered the area they searched to be his home is not relevant to the determination of whether he had a reasonable expectation of privacy in the containers. The upshot of the majority's reliance on this fact is that a homeless person who leaves his belongings in containers under an abutment receives greater protection under the fourth amendment than would a person who had a home but who placed articles there for other reasons. Though the intent of the majority in providing heightened fourth amendment protection for the homeless because of their unfortunate circumstances may be admirable, I find no support in the existing case law for the addition of a "circumstances of the searched" prong to the analysis of whether an expectation of privacy is reasonable.

The majority relies on two other factual considerations in its application of "first principles" to the container issue. The majority places great emphasis on the fact that the purpose of the search was to obtain evidence of a crime. In *California* v. *Ciraolo,* supra, 213, however, the United States Supreme Court expressly rejected the defendant's analogous claim that the purpose of the police in conducting aerial surveillance of his backyard was relevant to the issue of whether he had a reasonable expectation of privacy that protected him from such surveillance. See *Maryland* v. *Macon,* 472 U.S. 463, 470–71, 105 S. Ct. 2778, 86 L. Ed. 2d 370 (1985) (existence of fourth amendment seizure does not turn on subjective intent of police); cf. *Scott* v. *United States,* 436 U.S. 128, 137–38, 98 S. Ct. 1717, 56 L. Ed. 2d 168, reh. denied, 438 U.S. 908, 98 S. Ct. 3127, 57 L. Ed. 2d 1150 (1978) (police motive irrelevant in determination of whether a search or seizure

is reasonable because an objective standard is employed). In addition, although the issue of police motive was not discussed in *California* v. *Greenwood, supra,* it would seem that if the court were inclined to be concerned about the motive of the police, it would certainly have expressed some reservations in that case.

In support of its assertion that the motive of the police is relevant in determining whether the defendant had a reasonable expectation of privacy in the containers, the majority relies on *Hudson* v. *Palmer,* 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) (prisoner has no reasonable expectation of privacy in his cell), and the "inventory search" cases. *Florida* v. *Wells,* 495 U.S. 1, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990) (search of locked suitcase found in trunk of car impounded when driver arrested for driving under the influence); *Colorado* v. *Bertine,* 479 U.S. 367, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987) (search of a backpack found in impounded van). These cases, however, are inapposite. In the inventory search cases, the court has carved out an exception to the warrant requirement. *Colorado* v. *Bertine, supra,* 371. The police conduct in those cases clearly constituted a search under the fourth amendment, and therefore the issue was not whether the defendant had a reasonable expectation of privacy (i.e., was it a search for fourth amendment purposes), but rather whether the search was reasonable within the meaning of the fourth amendment even though it was conducted without a warrant. In contrast, the issue in the present case is whether the inspection of the contents of the duffle bag and box was a search subject to the limitations of the fourth amendment.

In *Hudson* v. *Palmer, supra,* 525–30, the court concluded that a search of a prison cell is not a search under the fourth amendment, but it reached that conclusion

not because the prisoner himself had left his personal effects generally open to the inspection of everyone, but rather because the policy of maintaining order in prisons mandates that a cell be subject to random inspections. The majority cites no cases in which courts have deemed police motive relevant to the question of whether police conduct constitutes a search when a privacy interest has been asserted in an area that is readily accessible to members of the public or in a container left in such an area.[4] Under the circumstances of this case, I would reject the attempt to employ a *subjective* test focused on police motive in the analysis of whether the defendant's expectation of privacy was *objectively* reasonable.

The majority also expresses concern that the defendant's arrest rendered him unable to assert his fourth amendment rights in the containers. I first note that there is no indication in the record either that the arrest of the defendant was made without probable cause or that it was a pretextual arrest motivated solely by a desire to effect a search of the abutment area. Furthermore, the majority's concern about the possibility of a pretextual arrest suffers from the same liability as its reliance on the investigatory purpose of the conduct

---

[4] The other cases cited by the majority in support of the proposition that police motive should be considered in this case discuss whether police motive is relevant to whether a search or seizure is reasonable within the meaning of the fourth amendment, not whether there was a search or seizure at all. See *United States* v. *Sumlin,* 909 F.2d 1218, 1220 (8th Cir.), cert. denied, U.S. , 111 S. Ct. 559, 112 L. Ed. 2d 566 (1990); *Amezquita* v. *Hernandez-Colon,* 518 F.2d 8, 12 n.7 (1st Cir. 1975), cert. denied, 424 U.S. 916, 96 S. Ct. 1117, 47 L. Ed. 2d 321 (1976); *Biehunik* v. *Felicetta,* 441 F.2d 228, 231 (2d Cir.), cert. denied, 403 U.S. 932, 91 S. Ct. 2256, 29 L. Ed. 2d 711 (1971); *United States* v. *Hagarty,* 388 F.2d 713, 717–18 (7th Cir. 1968). Additionally, each of these cases appears to conflict with *Scott* v. *United States,* 436 U.S. 128, 137–38, 98 S. Ct. 1717, 56 L. Ed. 2d 168, reh. denied, 438 U.S. 908, 98 S. Ct. 3127, 57 L. Ed. 2d 1150 (1978), in which the court stated that police motive is irrelevant to the question of whether a search or seizure is reasonable.

of the police, namely, that police motive is irrelevant to the question of whether the defendant had a reasonable expectation of privacy in the cardboard box and duffel bag.

The typical pretextual arrest scenario involves a police officer who arrests a person for crime A hoping to discover evidence of crime B during the course of a search incident to the arrest or an inventory search. See W. LaFave, Search and Seizure (2d Ed. 1987) § 1.4 (e), pp. 92–93, and cases cited therein. The pretextual arrest cases, however, are simply inapposite if opening the duffel bag and cardboard box did not, in the first place, constitute a search under the fourth amendment. Pretextual arrest doctrine addresses the issue of whether police conduct constituting a search violated the "reasonable search" provisions of the fourth amendment, not whether the police conduct in question was a search to which the fourth amendment applies. See id. Therefore, by invoking a concern about pretextual arrests, the majority leapfrogs the very issue it purports to address, i.e., whether the fourth amendment applies to this case at all.[5]

I find the majority's reliance on the defendant's privacy interest in the *interior* of the containers singularly puzzling. The majority states that in none of the abandonment cases did the courts consider the defendant's independent privacy interest in the interior of the containers. It appears that the majority is presuming that because the analysis in the abandonment cases focused on whether the owner of the container had a reasonable expectation of privacy in the area where the container was left, that those courts therefore ignored the privacy interest in the contents

---

[5] The majority indicates that it is not in fact concerned about pretextual arrests, yet it wholly fails to explain how the defendant's arrest is relevant to the question of whether his subjective expectation of privacy was reasonable.

of the containers. It seems axiomatic that the privacy interest in the interior of the containers is precisely what those cases, or any container case for that matter, are all about. The emphasis placed on the area where the containers were located does not mean that those courts did not consider the privacy interest in the containers' contents; rather, the location of the containers was important because it played a major role in determining whether the containers were likely to be disturbed by members of the public, and therefore whether the asserted privacy interest in the contents of the containers was objectively reasonable. See *California* v. *Greenwood,* supra, 40–41; *United States* v. *Thomas,* supra, 845–46 n.5; *United States* v. *Oswald,* supra, 667; *United States* v. *Brown,* supra, 954; *St. Paul* v. *Vaughn,* supra, 346; see also *United States* v. *Ross,* 456 U.S. 798, 822–23, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982) (degree of protection provided to containers by fourth amendment "varies in different settings").

The third factor cited by the majority in distinguishing the abandonment cases is the existence in most of those cases of conduct indicating an intent to relinquish temporarily an expectation of privacy in the container. While it is certainly true that the existence of such conduct by the owner of the container makes it less likely that a court would deem any subjective expectation of privacy reasonable, the majority acknowledges that this conduct is simply a relevant factor, rather than a necessary condition for concluding that there was no reasonable expectation of privacy. I also note that in *United States* v. *Brown,* supra (suitcase buried under chicken coop), and in *St. Paul* v. *Vaughn,* supra (eyeglass case hidden under counter in dry cleaning establishment), the conduct of the owners of the containers demonstrated no such intent. *Brown* and *Vaughn* demonstrate that the mere act of "hiding" a container in an area readily accessible to the public is insufficient

to support a claim that the owner had an objectively reasonable expectation of privacy in the contents.

The predominant factor in determining whether the defendant relinquished a privacy interest in the duffel bag and cardboard box is whether, in light of the nature of the abutment area where these containers were left, a reasonable person would have expected that their contents would be safe from "animals, children, scavengers, snoops, and other members of the public." *California* v. *Greenwood,* supra, 40.[6] This objective inquiry is not dependent on whether one might find it offensive that the defendant's subjective expectation of privacy was violated; rather, it must solely reflect a realistic assessment of the likelihood that his privacy interest might be invaded.[7]

I believe that the majority has allowed the current publicity and concern for the plight of the homeless to create an empathy that in turn has created bad fourth

[6] In *United States* v. *Hedrick,* 922 F.2d 396 (7th Cir. 1991), the court held that the defendant had no reasonable expectation of privacy in garbage placed in cans that were within the curtilage of the house. Noting that the United States Supreme Court had not employed principles of abandonment in *California* v. *Greenwood,* 486 U.S. 35, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988), the court questioned whether abandonment is still a viable doctrine. *United States* v. *Hedrick,* supra, 398. The court's analysis, therefore, focused on whether the garbage was readily accessible to the public even though it was within the curtilage of the house. Id., 400.

[7] In *California* v. *Greenwood,* 486 U.S. 35, 40 nn.3–4, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988), the court relied, in part, on the fact that "scavengers" often go through dumps looking for items of value, while reporters for tabloids have been known to search the garbage of public figures. See also *United States* v. *Thomas,* 864 F.2d 843, 845–46 n.5 (D.C. Cir. 1989) (defendant's ability to retrieve gym bag left in public hallway depended on fortuity that other persons left it undisturbed), citing *United States* v. *Jones,* 707 F.2d 1169, 1172 (10th Cir.), cert. denied, 464 U.S. 859, 104 S. Ct. 184, 78 L. Ed. 2d 163 (1983).

I also note that the trial court's assessment of whether it was likely that these containers would remain inviolate is a factual finding entitled to great deference. See footnote 3, supra.

amendment law. I would conclude that the defendant did not have a reasonable expectation of privacy in the contents of the duffel bag and cardboard box and affirm the judgment of the trial court.